Green, J.
delivered the opinion of the court.
The plaintiff in error was convicted in the Giles circuit court, for wearing a bowie knife concealed under his clothes, under the act of 1837-8, ch. 137, sec. 2, which provides, “That if any person shall wear any bowie knife, or Arkansas tooth-pick, or other knife or weapon, that shall in form, shape or size resemble a bowie knife or Arkansas tooth-pick, under his clothes, or keep the same concealed about his person, such person shall be guilty of a misdemeanor, and upon conviction thereof, shall be fined in a sum not less than two hundred dollars, and shall be imprisoned in the county jail, not less than three months and not more than six months.”
*156 It is now insisted that the above' act of the legislature Is Uncoil-' stitutional, and therefore the judgment in this case should have been arrested.
In the first article of the Constitution of this State, containing a declaration of rights, sec. 26, it is declared, “That the free white men of this State, have a right to keep and bear arms for their common defence.”
This declaration, it is insisted, gives to every man the right to arm himself in any manner he may choose, however unusual or dangerous the weapons he may employ; and thus armed, to appear wherever he may think proper, without molestation or hindrance, and that any law regulating his social conduct, by restraining the use of any weapon or regulating the manner in which it shall be carried, is beyond the legislative competency to enact, and is void.
In order to have a just and precise idea of the meaning of the clause of the constitution under .consideration, it will be useful to look at the state of things in the history of our ancestors, and thus comprehend the reason of its introduction into our constitution.
By the act of 22 and 23, Car. 2d, ch. 25, sec. 3, it is provided that no person who has not lands of the yearly value of £100, other than the son and heir apparent of an esquire, or other person of higher degree, &c., shall be allowed to keep a gun, &c. By this act, persons of a certain condition in life were allowed to keep arms, while a large proportion of the people were entirely disarmed. But King James the 2d, by his own arbitrary power, and contrary to law, disarmed the Protestant population, and quartered his Catholic soldiers among the people. This, together with other abuses, produced the revolution by which he was compelled to abdicate the throne of England. William and Mary succeeded him, and in the first year of their reign, Parliament passed an act recapitulating the abuses which existed during the former reign, and declared the existence of certain rights which they insisted upon as their undoubted privileges. Among these abuses, they say, in sec. 5, that he had kept a “standing army within the kingdom in time of peace without consent of Parliament, and quartered soldiers contrary to law.” Sec. 6. “By causing several good subjects, being Protestants, to be disarmed, at the same time when Papists were both armed and employed contrary to law.”
In the declaration of rights that follows, sec. 7 declares, that “the subjects which are Protestants may have arms for their de- *157 fence, suitable to their condition and as allowed by law.” This declaration, although it asserts the right of the Protestants to have arms, does not extend the privilege' beyond the terms provided in the act of Charles 2d, before referred to. “They may have arms,” says the Parliament, “suitable to their condition, and as allowed by law.” The law, we have seen, only allowed persons of a certain rank to have arms, and consequently this declaration of right had reference to such only. It was in refereñce to these facts, and to this state of the' English law, that the second section'of the amendments to the Constitution of the United States was incorporated into that instrument. It declares that “a well regulated militia being necessary to the security of, a free State, the right of the people to keep and bear arms shall not' be infringed.”
In the same view, the section under consideration of our pwn bill of rights was adopted. . . ,
The evil that was produced by disarming the people in the .time of James the second, was, that the King, by means of a standing army, quartered among the people, was able to overawe them, and compel them to submit to the most arbitrary, cruel and illegal measures. Whereas, if the people had retained their arms, they would have been able, by a just and proper resistance to those oppressive measures, either to have caused the King to respect their rights, or surrender (as he was eventually compelled to do) the government into other hands. No private defence was contemplated or would have availed any thing. If the subjects had been armed, they could have resisted the payment of excessive fines, or the infliction of illegal and cruel punishments. When, therefore, Parliament says, that “subjects which are Protestants, may have arms for their defence, suitable to their condition as allowed by law,” it does not mean for private defence, but being armed, they may as a body, rise up to defend their just rights, and compel their rulers to respect the laws. This declaration of right is made in reference to the fact before complained of, that the people had been disarmed, and soldiers had been quartered among them contrary to law. The complaint was against the government. The grievances to which they were thus forced to submit, were for the most part of a public character, and could have been redressed only by the people rising up for their common dfence to vindicate their rights.
The section under consideration, in our bill of rights, was adopt- *158 éd in reference to these historical facts* and in this point of view its language is most appropriate and expressive. Its words are, “The free white men of this State have a right to keep and bear arms for their common defence.” It, to be sure, asserts the right much more broadly than the statute of first William and Mary. For the right there asserted, is subject to the disabilities contained in the act of Charles the second. There lords and esquires, and their sons and persons, whose yearly income from land amounted to one hundred pounds, were of suitable condition to keep arms. But, with us, every free white man is of suitable condition; and, therefore, every free white man may keep and bear arms. But to keep and bear arms for what? If the history of the subject had left in doubt the object for which the right is secured, the words that are employed must completely remove that doubt. It is declared that they may keep and bear arms for their common defence. The word “common” here nsed, means according to Webster; I. Belonging equally to more than one, or to many indefinitely. 2. Belonging to the public. 3. General. 4. Universal. 5. Public. The object then, for which the right of keeping and bearing arms is secured, is the defence of the public. The free white men may keep arms to protect the public liberty, to keep in awe those who are in power, and to maintain the supremacy of the laws and the constitution. The words “bear arms” too, have reference to their military use, and were not employed to mean wearing them about the person as part of the dress. As the object for which the right to keep and bear arms is secured, is of general and public nature, to be exercised by the people in a body, for their common defence, so the arms, the right to keep which is secured, are such as are usually employed in civilized warfare, and that constitute the ordinary military equipment. If the citizens have these arms in their hands, they are prepared in the best possible manner to repel any encroachments apon their rights by those in authority. They need not, for such a purpose, the use of those weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin. These weapons would be useless in war. They could not be employed advantageously in the common defence of the citizens. The right to keep and bear them, is not, therefore, secured by the constitution.
A thousand inventions for inflicting death may be imagined, which might come under the appellation of an “arm” in the figura *159 tive use of that term, and which could by no possibility be rendered effectual in war, or in the least degree aid in the common defence» Would it not be absurd to contend that a constitutional provision, securing to the citizens the means of their common defence, should be construed to extend to suck weapons, 'although they manifestly would not contribute to that end, merely because, in the hands of an assassin, they might take away life?
The legislature, therefore, have a right to prohibit the wearing, or keeping weapons dangerous to the peace and safety of the citizens, and which are not usual in civilized warfare, or would not contribute to the common defence. The right to keep and bear arms for the common defence is a great political right. It respects the citizens on the one hand and the rulers on the other. And although this right must be inviolably preserved, yet, it does not follow that the legislature is prohibited altogether from passing laws regulating the manner in which these arms may be employed.
To hold that the legislature could pass no law upon this subject, by which to preserve the public peace, and protect our citizens from the terror, which a wanton and unusual exhibition of arms might produce, or their lives from being endangered by desperadoes with concealed arms, would be to pervert a great political right to the worst of purposes, and to make it a social evil, of infinitely a greater extent to society, than would result from abandoning the right itself.
Suppose it were to suit the whim of a set of ruffians to enter the theatre in the midst of the performance, with drawn swords, guns and fixed bayonets, or to enter the church in the same manner, during service, to the terror of the audience ; and this were to become habitual; can it be, that it would be beyond the power of the legislature to pass laws to remedy such an evil? Surely not. If the use of arms in this way cannot be prohibited, it is in the power of fifty armed ruffians to break up the churches, and all other public assemblages, where they might lawfully come, and there would be no remedy. But we are perfectly satisfied that a remedy might be applied. The convention in securing the public political right in question, did not intend to take away from the legislature all power of regulating the social relations of the citizens upon this subject. It is true, it is somewhat difficult to draw the precise line where legislation must cease, and where the political right begins, but it is not difficult to state a case where the right of legisla *160 tion would exist. The citizens have the unqualified right to keep the weapon, it being of the character before described, as being intended by this provision. But the right to bear arms is not of that unqualified character. The citizens may bear them for the common defence; but it does not follow, that they may be borne by an individual, merely to terrify the people, or for purposes of private assassination. And as the manner in which they are worn, and circumstances under which they are carried, indicate to every man, the ‘purpose of the wearer, the legislature may prohibit such manner of wearing as would never be resorted to by persons engaged in the common defence.
We are aware that the court of appeals of Kentucky, in the case of Bliss vs. The Commonwealth, 2 Littel’s Rep. 90, has decided that an act of their legislature, similar to the one now under consideration, is unconstitutional and void. We have great respect for the court by whom that decision was made, but we cannot concur in their reasoning.
We think the view of the subject which the opinion of the court in that case takes, is far too limited for a just construction of the meaning of the clause of the constitution they had under consideration. It is not precisely in the words of our constitution, nevertheless, it is of the same general import.. The words are, that “the right of the citizens to bear arms in defence of themselves, and the State, shall not be questioned.”
In the former part of this opinion, we have recurred to the circumstances under which a similar provision was adopted in England, and have thence deduced the reason of its adoption, and consequently have seen the object in view, when the right to keep and bear arms was secured. All these considerations are left out of view, in the case referred to, and the court confine themselves entirely to the consideration of the distinction between a law prohibiting the right, and a law merely regulating the manner in which arms may be worn. They say, there can be no difference between a law prohibiting the wearing concealed weapons, and one prohibiting the wearing them openly.
We think there is a manifest distinction. In the nature of things, if they were not allowed to bear arms openly, they could not bear them in their defence of the State at all. To bear arms in defence of the State, is to employ them in war, as arms are usually employed by civilized nations. The arms, consisting of swords, mus *161 kets, rifles, &c., must necessarily be borne openly; so that a prohibition to bear them openly, would be a denial of the right altogether. And as in their constitution, the right to bear arms in de-fence of themselves, is coupled with the right to bear them in de-fence of the State, we must understand the expressions as meaning the same thing, and as relating to public, and not private; to the common, and not the individual defence.
But a prohibition to wear a spear concealed in a cane, would in no degree circumscribe the right to bear arms in defence of the State; for this weapon could in no degree contribute to its defence, and would be worse than useless in an army. And, if, as is above suggested, the wearing arms in defence of the citizens, is taken to mean, the common defence, the same observations apply.
To’make this view of the case still nfore clear, we may remark, that the phrase, “bear arms,” is used in the Kentucky constitution as well as in our own, and implies, as has already been suggested, their military use. The 28th section of our bill of rights provides, “that no citizen of this State shall be compelled to bear arms, provided he will pay an equivalent, to be ascertained by law.” Here we know that the phrase has a military sense, and no other; and we must infer that it is used in the same sense in the 26th section, which secures to the citizen the right to bear arms. A man in the pursuit of deer, elk and buffaloes, might carry his rifle every day, for forty years, and, yet, it would never be said of him, that he had borne arms, much less could it be said, that a private citizen bears arms, because he has a dirk or pistol concealed under his clothes, or a spear in a cane. So that, with deference, we think the argument of the court in the case referred to, even upon the question it has debated, is defective and inconclusive.
In the case of Simpson vs. The State, 5th Yer. Rep. 356, Judge White, in delivering the opinion of the court, makes use of the general expression, that “by this clause in the constitution, an express power is given, and secured to all the free citizens in the State to keep and bear arms for their defence, without any qualification whatever, as to their kind and nature.”
But in that case, no question as to the meaning of this provision in the constitution arose, or was decided by the court, and the expression is only an incidental remark of the judge w.ho delivered the opinion, and, therefore, is entitled to no weight.
We think, therefore, that upon either of the grounds assumed in *162 this opinion, the legislature had the right to pass the law under which the plaintiff in error was convicted. Let the judgment be affirmed.