******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JASON
WILLIAM DECICCIO
(SC 19104)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald,
Espinosa and Vertefeuille, Js.

*Argued October 23, 2013—officially released December 23, 2014*

*Michael Zariphes*, assigned counsel, for the appellant (defendant).

*Nancy L. Walker*, special deputy assistant state's attorney, with whom, on the brief, was *Brian Kennedy*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. The defendant, Jason William DeCiccio, has an extensive weapons collection that includes a dirk knife and a police baton. A jury found him guilty of two counts of having a weapon in a motor vehicle, in violation of General Statutes (Rev. to 2009) § 29-38 (a),[1] for using his Jeep Cherokee (Jeep) to transport those items from his former residence in Connecticut to his new residence in Massachusetts. The defendant appeals from the judgment of conviction, rendered by the trial court in accordance with the jury's verdict, contending, inter alia, that § 29-38 is unconstitutional as applied to his conduct in the present case. Specifically, he claims that § 29-38: (1) is impermissibly vague because the terms "dirk knife" and "police baton" are not defined with sufficient clarity; and (2) violates the second amendment to the United States constitution insofar as it precluded him from using a vehicle to transport those weapons for the purpose of moving from one residence to another. We conclude that § 29-38 is not unconstitutionally vague as applied to the facts of this case. We also conclude, however, first, that the possession of a dirk knife and a police baton in a person's home is protected by the second amendment and, second, that our statutory scheme, which categorically bars the transportation of those weapons by motor vehicle from a former residence to a new residence, impermissibly infringes on that constitutional right. Because the state acknowledges that the jury found that the defendant was transporting those weapons between residences when the police discovered them in his vehicle, his conviction cannot stand. Accordingly, we reverse the judgment of the trial court.

The record reveals the following facts, which the jury reasonably could have found, and procedural history. In 2010, the United States Veterans Health Administration hired the defendant, a member of the United States Army and the Army National Guard who had served overseas in numerous locations and capacities, to work as a medical claims processor at a Veterans Administration (VA) hospital in Massachusetts. On July 22, 2010, the defendant was in the process of moving his belongings from his residence at his mother's home in the town of Clinton to his new residence, a room in a private home in Bolton, Massachusetts, that he had rented. While driving on West Main Street in Clinton, at approximately 4:30 p.m., the defendant's Jeep struck another sport utility vehicle that was stopped at a traffic light, causing that vehicle to strike the vehicle in front of it. The defendant then reversed his Jeep and drove into a parking lot located across the street from the accident scene. After emergency personnel arrived, the defendant, who could not recall his own name, informed police that he had suffered a head injury, and he appeared disoriented and combative.[2] The defendant

was subsequently transported by ambulance to Yale-New Haven Hospital (hospital), where he was admitted and treated for head injuries and post-traumatic stress disorder.

While assessing the damage to the defendant's Jeep, Gregory Matakaetis, a Clinton police officer who had responded to the accident, observed two machete knives in plain view in the back seat of the Jeep. Matakaetis also discovered an expandable police baton, a belt clip holder for the baton, a sword and holder, a large knife with a brass knuckle handle that had a depiction of a dragon on it (dragon knife), and a dirk knife. Matakaetis found a military dog tag, lead weights, and a black "duty bag" in the Jeep, as well. The defendant had kept all of these items as mementos of his military service overseas in Afghanistan, Germany, and Kosovo, and was in the process of moving them to his new residence in Massachusetts when he was involved in the automobile accident.

Following his release from the hospital, the state charged the defendant in a substitute information with six counts of having a weapon in a motor vehicle in violation of § 29-38 (a). Each count alleged the unlawful possession of one of the seized items, specifically, the police baton, the two machete knives, the dirk knife, the sword, and the dragon knife. The case was tried to a jury, which found the defendant guilty of unlawfully having the police baton and the dirk knife in his vehicle, and not guilty with respect to the other four counts.[3] The trial court rendered a judgment of conviction in accordance with the jury's verdict and sentenced the defendant to a total effective sentence of three years imprisonment, execution suspended after fifteen months, and three years probation with special conditions. The trial court subsequently denied the defendant's postverdict motion for a judgment of acquittal, rejecting his claims that § 29-38 is unconstitutionally vague as applied and violates the second amendment. This appeal followed.[4]

On appeal, the defendant claims that § 29-38 is unconstitutionally vague as applied to the facts of the present case because he had inadequate notice that the weapons that formed the basis of his conviction fall within the proscription of that statutory provision. The defendant also contends that, as applied to his conduct, § 29-38 contravenes his second amendment right to bear arms because it afforded him no lawful means of transporting his dirk knife and police baton to his new residence, thereby effectively precluding him from possessing those weapons at his new residence. We reject the defendant's claim that § 29-38 is unconstitutionally vague. We agree, however, first, that the second amendment protects the defendant's right to possess the dirk knife and police baton in his home and, second, that the statute's complete ban on transporting those items

between residences unduly burdens that right.[5] The defendant's conviction, therefore, must be reversed.[6]

I

WHETHER § 29-38 IS UNCONSTITUTIONALLY VAGUE AS APPLIED

We begin with the defendant's contention that § 29-38 is unconstitutionally vague as applied, first, because the terms "dirk knife" and "police baton," which are not statutorily defined, do not otherwise have a sufficiently clear or definite meaning and, second, because § 29-38 is impermissibly ambiguous as to whether the moving exception of § 29-38 (b) (5) (D), which does not expressly include within its terms dirk knives and police batons, nevertheless extends to those items. We are not persuaded by either of the defendant's vagueness arguments.

Before addressing the merits of the defendant's claims, we set forth the legal principles applicable to those claims. "The determination of whether a statutory provision is unconstitutionally vague is a question of law over which we exercise de novo review. . . . In undertaking such review, we are mindful that [a] statute is not void for vagueness unless it clearly and unequivocally is unconstitutional, making every presumption in favor of its validity. . . . To demonstrate that [a statute] is unconstitutionally vague as applied to him, the [defendant] therefore must . . . demonstrate beyond a reasonable doubt that [he] had inadequate notice of what was prohibited or that [he was] the victim of arbitrary and discriminatory enforcement. . . . [T]he void for vagueness doctrine embodies two central precepts: the right to fair warning of the effect of a governing statute . . . and the guarantee against standardless law enforcement. . . . If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties." (Citation omitted; internal quotation marks omitted.) *State* v. *Winot*, 294 Conn. 753, 758–59, 988 A.2d 188 (2010). Moreover, an ambiguous statute will be saved from unconstitutional vagueness if the core meaning of the terms at issue may be elucidated from other sources, including other "statutes, published or unpublished court opinions in this state or from other jurisdictions, newspaper reports, television programs or other public information . . . ." *State* v. *Scruggs*, 279 Conn. 698, 719, 905 A.2d 24 (2006).

Finally, even though a statutory term that is susceptible to a number of differing interpretations may be impermissibly vague as applied to some situations, the term is not necessarily vague as applied in all cases; rather, whether the statute suffers from unconstitutional vagueness is a case-specific question, the resolution of which depends on the particular facts involved.

See, e.g., *State ex rel. Gregan* v. *Koczur*, 287 Conn. 145, 156–57, 947 A.2d 282 (2008). Similarly, a term is not void for vagueness merely because it is not expressly defined in the relevant statutory scheme. *State* v. *Jacob*, 69 Conn. App. 666, 674, 798 A.2d 974 (2002). Thus, we must analyze the language and purpose of § 29-38 (a) to determine if it has a reasonably ascertainable, core meaning such that, as applied to the defendant's possession of the weapons at issue in the present case, he had fair notice that those weapons fall within the proscription of that statutory provision. See, e.g., *State* v. *Wilchinski*, 242 Conn. 211, 221–23, 700 A.2d 1 (1997).

A

Whether the Statutory Terms "Dirk Knife" and "Police Baton" Are Unconstitutionally Vague

We begin with the defendant's claim that § 29-38 is unconstitutionally vague because the terms "dirk knife" and "police baton" are not statutorily defined and their meaning is not otherwise sufficiently clear or definite to satisfy the requirement of fair notice. To resolve this claim, we must determine whether the process of statutory interpretation reveals a core meaning for those terms such that a person of ordinary intelligence would be able to understand what class or type of weapon the legislature intended to ban by its prohibition against having a dirk knife or a police baton in a motor vehicle. In performing this task, we first consider the language of § 29-38 (a), which provides in relevant part: "Any person who knowingly has, in any vehicle owned, operated or occupied by such person, any weapon . . . shall be fined not more than one thousand dollars or imprisoned not more than five years or both, and the presence of any such weapon . . . in any vehicle shall be prima facie evidence of a violation of this section by the owner, operator and each occupant thereof. . . ." For purposes of § 29-38 (a), the word "weapon" includes "any police baton or nightstick" and "any dirk knife . . . ." Because it is apparent that the language of § 29-38 provides no ready answer to the constitutional question raised by the defendant's claim, we must use other available tools of statutory construction to resolve that claim.

1

Dirk Knife

We first address the defendant's contention that the term "dirk knife" is unconstitutionally vague and, as a result, § 29-38 "impermissibly delegates the resolution of the definition of [the term] to be determined by [police officers], judges and juries on [an] ad hoc and subjective basis." By way of illustration, the defendant notes that, in contrast to Connecticut's statutory scheme, which contains no definition of the term, California has enacted legislation that expressly defines the term "dirk"; Cal. Penal Code § 16470 (Deering 2012);[7]

an action by the California legislature that remedied flaws identified by court decisions applying previous versions of the California statute. The defendant also maintains that there is ambiguity in the word "dirk" because, although common usage treats the terms "dirk" and "dagger" as synonyms, the technical meaning of the term, as explicated by various cutlery treatises, demonstrates that a dirk is not necessarily a dagger, but may also be a knife with a single-edged blade. In this regard, the defendant also asserts that numerous dictionary definitions of the term "dirk" do not specifically identify a dirk as a double-edged knife. The state contends that the meaning of the term "dirk knife," namely, a knife designed primarily for stabbing and featuring a sharp tapered blade, is readily accessible from numerous online and print sources, including sister state case law. See, e.g., *Summerall* v. *State*, 41 So. 3d 729, 736–37 (Miss. App. 2010); *In re Jesse QQ.*, 243 App. Div. 2d 788, 789–90, 662 N.Y.S.2d 851, appeal denied, 91 N.Y.2d 804, 691 N.E.2d 631, 668 N.Y.S.2d 559 (1997). We agree with the state that, as applied to the present case, § 29-38 is not void for vagueness with respect to the term "dirk knife" because the core meaning of that term includes a knife, like the knife seized from the defendant's vehicle, that is designed primarily for stabbing purposes, rather than for utilitarian purposes, and that has a blade with sharpened edges and a narrowed or tapered point, as well as a handle with guards intended to facilitate the act of stabbing or thrusting.

We commence our analysis of the defendant's claim with a description of the knife at issue, which is comprised of a black handle and a metal blade. The handle is four and one-half inches long and one inch wide, and terminates with a two inch guard. The dagger like blade of the knife, both edges of which are sharpened, is approximately one and one-half inches wide and five and one-half inches long. A distinctive feature of the knife is that, two and one-half inches from the hilt, the blade forks into two distinct parallel prongs with a small space between them that taper to independent sharp points.

We turn next to the term "dirk knife." Because General Statutes § 1-1 requires us to construe statutory words and phrases "according to the commonly approved usage of the language," we look to the dictionary to determine the commonly understood meaning of the term. E.g., *Sams* v. *Dept. of Environmental Protection*, 308 Conn. 359, 404, 63 A.3d 953 (2013). Consistent with the definition that the defendant posits in his brief, a dictionary that this court often uses in accordance with § 1-1 defines "dirk" as "a long straight-bladed dagger . . . ." Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) p. 354. "Dagger," in turn, is defined in relevant part as "a sharp pointed knife for stabbing . . . ." Id., p. 313. Similarly, another oft-cited

dictionary defines "dirk" as "[a] dagger"; American Heritage Dictionary of the English Language (5th Ed. 2011) p. 512; and the word "dagger" is defined in relevant part as "[a] short pointed weapon with sharp edges. . . ." Id., p. 456.

Because, for present purposes, these dictionary definitions of the term "dirk" are not entirely elucidating, we turn to extrinsic evidence of the intended meaning of the term. Although there is no recorded legislative history providing direct insight into the legislature's contemplation of the meaning of the term "dirk," it bears noting that the legislature added it to the statutory scheme in 1953 with the enactment of Public Acts 1953, No. 205, §§ 1 and 2, which amended the dangerous weapons statutes, now codified at § 29-38 (a) and General Statutes § 53-206 (a),[8] by expanding the definition of the term "weapon" to include "any dirk knife or switch knife or any knife having an automatic spring release device by which a blade is released from the handle, having a blade of over one and a half inches in length . . . ." The scant legislative history accompanying the enactment of that public act reflects the fact that the legislature was concerned with a proliferation of stabbings caused by dangerous knives, particularly those with long blades and switchblades. See 5 S. Proc., Pt. 3, 1953 Sess., pp. 1073–75, remarks of Senators Joseph S. Longo and Patrick J. Ward.

The case law of other states invariably construes the term "dirk knife" in statutes similar to § 29-38 as a knife designed or primarily intended for use as a stabbing weapon. For example, in *Summerall* v. *State*, supra, 41 So. 3d 729, the Mississippi Court of Appeals engaged in an extensive discussion of the meaning of the term and concluded that, "to qualify as a dirk knife, the weapon must . . . be designed primarily for use as a stabbing weapon," and, to that end, it also must "have a blade with at least one sharpened edge which tapers to a point . . . ." Id., 737. In adopting this definition, the court in *Summerall* was persuaded by the analysis undertaken by the Appellate Division of the New York Supreme Court in *In re Jesse QQ.*, supra, 243 App. Div. 2d 788, which had reached the same conclusion regarding the meaning of the term "dirk." Id., 789 (explaining that "test for a dirk is whether the instrument has a blade with at least one sharpened edge [that] tapers to a point and is primarily intended for use as a stabbing weapon").

Statutory provisions and case law from other states, as well as reference treatises on cutlery, are generally consistent with *Summerall* and *In re Jesse QQ.* See, e.g., Cal. Penal Code § 16470 (Deering 2012) ("[a]s used in this part, 'dirk' or 'dagger' means a knife or other instrument with or without a handguard that is capable of ready use as a stabbing weapon that may inflict great bodily injury or death"); *State* v. *Walthour*, 876 So. 2d

594, 597 (Fla. App. 2004) (" 'Dirk' and 'dagger' are used synonymously, and consist of any straight stabbing weapon. The test is its capacity for use [as] a stabbing weapon."); *Commonwealth* v. *Miller*, 22 Mass. App. 694, 697, 497 N.E.2d 29 (1986) (concluding that five inch by one and one-half inch, single-edged asymmetrical blade in folded knife was not "enough like a dirk to be proscribed" by state's dangerous weapons statute, but noting that characteristics, such as "a blade tapering to a sharpened tip, may indicate that the knife in question, though shorter than a normal dirk, was indeed designed for stabbing"); *Knight* v. *State*, 116 Nev. 140, 145–47, 993 P.2d 67 (2000) ("a dirk appears to be simply a type of dagger," which is "a short weapon used for thrusting and stabbing," and "[r]elevant factors to consider when determining whether a knife is a dirk or dagger include whether the knife has handguards and a blade that locks in place" [internal quotation marks omitted]); *State* v. *McJunkins*, 171 Or. App. 575, 579, 15 P.3d 1010 (2000) (skinning knife was not "dirk" or "dagger" under Oregon's concealed weapons statute because dirk is type of dagger, which is defined as knife that "is generally slender, straight, and coming to a point," and its "function is to stab, historically to pierce armor," and there was no evidence that skinning knife "was designed for stabbing"); see also E. Janes, The Story of Knives (1968) pp. 55, 67 (noting that original Scottish dirks had large, single-edged, straight blades but that subsequent daggers were cut down from old swords, with double-edged dirk used in early nineteenth century becoming "in fact, a short sword"); H. Peterson, American Knives: The First History and Collectors' Guide (1958) pp. 95–101 (describing "naval dirk" as "[t]he most colorful of all the naval knives" and "[a] companion to and substitute for the sword," with blade shape that evolved during nineteenth century from straight and double-edged to curved and then back to straight, and noting that dirks featured large handles separated from blade by prominent guards, or quillons).

In contrast to *Summerall* and *In re Jesse QQ.*, Virginia courts have indicated that a knife does not fall within the meaning of the term "dirk" unless both edges of its blade are sharpened. See *Thompson* v. *Commonwealth*, 277 Va. 280, 290–91, 673 S.E.2d 469 (2009) (butterfly knife with four inch blade and one-edged blade is not weapon of "like kind" to dirk because "[w]ithout two sharp edges and a protective guard . . . the butterfly knife is not designed for stabbing purposes like a dagger . . . but rather for cutting purposes"); *McMillan* v. *Commonwealth*, 55 Va. App. 392, 399, 686 S.E.2d 525 (2009) (concluding that knife at issue "does not fit the definition of a dirk, described as any stabbing weapon having two sharp edges and a point"); *Richards* v. *Commonwealth*, 18 Va. App. 242, 246 n.2, 443 S.E.2d 177 (1994) (explaining that "usual meaning" of " 'dirk' or weapon of like kind is any stabbing weapon having

two sharp edges and a point, including daggers, short swords and stilettos"). For purposes of the present case, however, we need not decide whether a knife with only one sharpened edge may constitute a dirk because the knife seized from the defendant's vehicle has two sharpened edges.

We therefore conclude that § 29-38 is not void for vagueness as applied to the defendant because the core meaning of the term "dirk knife" may be ascertained from case law in other states and available print reference materials on cutlery. The authorities to which we have cited make clear that, whatever else the term "dirk" may describe, at the very least, it applies to a knife that is designed primarily for stabbing purposes, rather than utilitarian purposes, has a blade with sharpened edges that tapers to a point, and has a handle with guards intended to facilitate the act of stabbing or thrusting. See, e.g., *Knight* v. *State*, supra, 116 Nev. 146; cf. N. Strung, An Encyclopedia of Knives (1976) p. 94. Accordingly, although we acknowledge the possibility that the statutory reference to dirk knives might be vague as applied to some knives, we are satisfied that a person of ordinary intelligence would be on notice that a knife that has all of the foregoing characteristics falls within the statute's "unmistakable core of prohibited conduct . . . ." (Internal quotation marks omitted.) *State ex rel. Gregan* v. *Koczur*, supra, 287 Conn. 156; see also id., 156–57 ("[a] defendant whose conduct clearly comes within a statute's unmistakable core of prohibited conduct may not challenge the statute because it is vague as applied to some hypothetical situation" [internal quotation marks omitted]). Furthermore, this definition is consistent with the general purpose of §§ 29-38 and 53-206, namely, to prohibit the carrying of knives that are primarily designed as stabbing weapons, and not for some other legitimate purpose. Because the defendant does not contend that the state failed to establish that the knife at issue in the present case had all of the characteristics that we have identified or that the evidence was otherwise insufficient, we now turn to his claim with respect to the police baton.

2

Police Baton

The defendant contends that he reasonably could not have known that the metal instrument that he carried in his Jeep and for which he was prosecuted, which is approximately one and one-half feet in length and consists of a ten inch long handle that connects to a telescoping metal rod, approximately one-half inch in diameter, which terminates with a semicircle metal bulb, is an expandable police baton within the meaning of § 29-38 (a). The defendant argues that the term is unconstitutionally vague because "an ordinary dictionary fails to even give a definition of a police baton."[9]

The state disputes the defendant's vagueness claim, relying on images obtained from the Internet that the state characterizes as "nearly identical" to the item seized from the defendant's Jeep, as well as dictionary definitions for the terms "baton" and the related "billy club." We agree with the state that the statute's ban on having a police baton in a vehicle is not void for vagueness as applied to the defendant in the present case.

Merriam-Webster's Collegiate Dictionary defines the word "baton" in relevant part as: "1. Cudgel, truncheon; specif[ically]: billy club . . . ."[10] (Emphasis omitted.) Merriam-Webster's Collegiate Dictionary, supra, p. 103. A "billy club" is defined as "a heavy, usu[ally] wooden club; specif[ically]: a police officer's club . . . ." (Emphasis omitted.) Id., p. 122; see also id., p. 303 (defining "cudgel" as "a short heavy club"); id., p. 1343 (defining "truncheon" as obsolete term for "club" and "bludgeon," and as "baton" or "a police officer's billy club"). We also note that the related term "nightstick," which is used in § 29-38 (a) along with "police baton," is defined synonymously as "a police officer's club . . . ." Id., p. 837. Although the dictionary definition of "baton" indicates that the term is commonly or frequently used to refer to an instrumentality made of wood, there is nothing in that definition that excludes such an instrumentality from its purview solely because it is made of something else. We therefore turn to extratextual sources to ascertain whether the expandable metal instrument seized from the defendant's vehicle is a police baton.

The legislative history of § 29-38 is silent as to the specific type of instruments that the legislature envisioned would fall within the definition of police baton or nightstick.[11] Statutes should be construed, however, to effectuate the legislature's intent, consistent with the ordinary meaning of the words used, as technologies evolve. See, e.g., *Rutledge* v. *State*, 745 So. 2d 912, 916 (Ala. Crim. App. 1999) (observing that "it is impossible for the [l]egislature to consider every societal and technological change that may occur and the effect those changes may have [on] the particular conduct it is seeking to regulate"). Thus, changes in technology will not render statutes void for vagueness when the intent of the legislature remains clear. See, e.g., *State* v. *Weeks*, 761 A.2d 44, 46–47 (Me. 2000) (statute not unconstitutionally vague as applied to computer files because statute "prohibiting the dissemination of videotapes, motion pictures, slides, and negatives depicting child pornography . . . clearly reaches the dissemination of stored images as well as finished pictures"). It is significant, then, that the technology of police batons and nightsticks has evolved from wooden nightsticks to include the widespread use of expandable metal batons in law enforcement agencies nationwide. Police departments adopting the use of expandable metal batons,

which are also referred to as collapsible batons, have done so because they are intermediate force devices that, when appropriately used, are unlikely to cause death or serious bodily injury, more comfortable for officers to wear and carry, and more easily accessible than conventional fixed batons. See, e.g., Federal Law Enforcement Training Center, United States Marshals Service, "The Expandable Baton (1997)" (training video), available at https://archive.org/details/gov. ntis.ava20437vnb1 (last visited November 28, 2014); D. Young, "Where Have All the Batons Gone?" PoliceOne.com (April 1, 2005), available at http:// www.policeone.com/police-products/less-lethal/ batons/articles/99726/ (last visited November 28, 2014); "Los Angeles: Commission OKs Use of Expandable Batons," L.A. Times, March 30, 1995, available at http:// articles.latimes.com/1995-03-30/local/me-48897_1_ expandable-baton (last visited November 28, 2014).

Furthermore, as the state notes, readily available descriptions and images of expandable batons are strikingly similar to the baton that the defendant in the present case possessed, a fact that supports the conclusion that a person of ordinary intelligence would or reasonably should be aware that possessing such an item in a motor vehicle violates § 29-38. See, e.g., Galls: The Authority in Public Safety Equipment and Apparel (online catalog displaying numerous models of expandable batons), available at http://www.galls.com/ expandable-batons (last visited November 28, 2014); see also California Dept. of Consumer Affairs, Bureau of Security and Investigative Services, "Baton Training Manual: Student Text" (March, 2006) p. 13 (describing characteristics of straight, expandable baton), available at http://www.bsis.ca.gov/forms_pubs/bat_stuman.pdf (last visited November 28, 2014). Indeed, it would be unreasonable, and incompatible with the statute's obvious public safety purpose, to conclude that § 29-38 cannot be read as encompassing expandable metal batons, particularly in view of the fact that these devices—like other weapons subject to the statute, such as dirks, stilettos, and certain martial arts weapons—may readily be reduced to an easily concealable size.

Finally, a construction of the term "police baton" as including metal expandable batons is consistent with the case law of other jurisdictions. See *Shahit* v. *Tosqui*, United States District Court, Docket No. 04-71538 (E.D. Mich. June 1, 2005) (noting that "extendable baton fits comfortably within the dictionary definitions of" terms "billy" and "bludgeon," which are not defined by Michigan criminal statutes), aff'd, 192 Fed. Appx. 382 (6th Cir. 2006); *People* v. *Patrick*, California Court of Appeal, Docket No. C067982 (Cal. App. July 31, 2012) (rejecting defendant's reliance on dictionary definitions indicating that "billy" is or usually is made from wood in concluding that metal expandable baton was "billy" within meaning of statute), review denied, California Supreme

Court, Docket No. S205337 (Cal. November 14, 2012); *People* v. *Mercer*, 42 Cal. App. 4th Supp. 1, 4–5, 49 Cal. Rptr. 2d 728 (App. Dept. Super. 1995) (concluding that possession of collapsible baton violated statute prohibiting possession of " 'any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sap, or sandbag' " because dictionary definition of "billy" encompasses club carried by police officer). But see *People* v. *Phillips*, New York County Court, Docket No. 2005-034 (N.Y. County April 1, 2005) (following *People* v. *Talbert*, 107 App. Div. 2d 842, 844, 484 N.Y.S.2d 680 [1985], which held that "the term 'billy' must be strictly interpreted to mean a heavy wooden stick with a handle grip [that], from its appearance, is designed to be used to strike an individual and not for other lawful purposes," in concluding that metal collapsible baton is not "billy" prohibited by New York statute proscribing criminal possession of weapon). Accordingly, we agree with the state that § 29-38 is not unconstitutionally vague as applied to expandable metal police batons.[12]

B

Whether § 29-38 Is Unconstitutionally Vague
with Respect to the Application of
the Moving Exception in
§ 29-38 (b) (5) (D)

The defendant next claims that § 29-38 is void for vagueness in the absence of a "clarification [of] the moving exception" contained in § 29-38 (b) (5) (D). The defendant, who characterizes the existing statute as "clearly susceptible to arbitrary and discriminatory enforcement," claims that we should place a judicial gloss on the moving exception of § 29-38 (b) (5) (D) and extend that exception to dirk knives and police batons. In support of this contention, the defendant maintains that we should follow our interpretation of the nearly identically worded § 53-206 (b) (3) (D)[13] in *State* v. *Campbell*, 300 Conn. 368, 13 A.3d 661 (2011), in which we read a similar exception into that statutory provision to avoid a construction of the provision that would have rendered it unworkable under certain circumstances. See id., 379–80. He contends that this judicial gloss is necessary because, "when reading [§ 29-38] as a whole and considering the exceptions set forth in [sub]section (b) of the statute, a person of ordinary intelligence such as [himself], who was also a member of the armed forces of this state (Army National Guard), could not and would not reasonably conclude that he would be prohibited from . . . transporting such weapons as those [at issue in the present case] while moving them from his former residence to his new residence."

The defendant's claim is belied by the plain language of § 29-38. Subsection (a) of § 29-38 prohibits certain conduct, including, of course, the vehicular transporta-

tion of dirk knives and police batons, and subsection (b), which is comprised of numerous subdivisions and subparagraphs that operate as affirmative defenses to be pleaded and proven by the defendant,[14] contains no language that even arguably would authorize the defendant's transportation of a dirk knife or a police baton. Indeed, § 29-38 (b) does provide for certain exceptions to the general prohibition against having a dirk knife or a police baton in a vehicle. For example, under § 29-38 (b) (2), a security guard may have a police baton in a vehicle while engaged in the pursuit of his official duties, and § 29-38 (b) (5) permits the transportation of knives, the edged portion of which is four inches or more in length, in a vehicle under certain enumerated circumstances. The defendant has identified no such exception, however, that might be construed as permitting his transportation of a dirk knife or police baton in his vehicle. Consequently, there is nothing in the statutory language to support the contention that it is unclear whether the defendant's conduct in the present case was exempt from prosecution under § 29-38 (b).

The defendant's reliance on *State* v. *Campbell*, supra, 300 Conn. 368, in which we construed § 53-206, the related and nearly identical statute prohibiting the carrying of dangerous weapons, is misplaced. In fact, *Campbell* undermines the defendant's claim. In *Campbell*, the defendant, Andre Campbell, was convicted under § 53-206 (a) of carrying a dangerous weapon, in particular, a switchblade knife, "in connection with an incident that took place in a common hallway of the college dormitory where he resided." Id., 370–71. The issue in that case was whether Campbell was entitled to a jury instruction on an "implied exception to § 53-206 if the jury found that the conduct occurred in his place of abode," and, more specifically, "[w]hether the Appellate Court properly [had] relied on *State* v. *Sealy*, 208 Conn. 689, 546 A.2d 271 (1988), to conclude that a residence or place of abode cannot include common corridors and areas used to access a bathroom, kitchen and other areas necessary to life . . . ." (Internal quotation marks omitted.) *State* v. *Campbell*, supra, 371. Following oral argument, however, we ordered supplemental briefing "on the question of whether subparagraphs (D) and (E) of § 53-206 (b) (3) provide[d] an implicit exception for the carrying of a weapon in an individual's residence or place of abode for any weapon other than a knife, the edged portion of the blade of which is four inches or more in length (long knife)." Id., 371–72.

We concluded that the statutory exception pertaining to the carrying of knives, namely, § 53-206 (b) (3), which is identical to § 29-38 (b) (5) in all material respects, does not apply to weapons other than long knives. Id., 378. Observing that the pre-1999 version of § 53-206 (b) had maintained a broader "exception for 'any . . .

weapon or implement' listed in the prohibitory clause," we "conclude[d] that the exceptions set forth in subparagraphs (D) and (E) of § 53-206 (b) (3) [that is, the moving exception and the repair exception] plainly and unambiguously appl[ied] only to the carrying of long knives." Id. Although we "reaffirm[ed] our holding in *State* v. *Sealy*, supra, 208 Conn. 693 [and n.2],[15] that the language of what is now § 53-206 (b) (3) (D) and (E) implicitly provides an exception for carrying a long knife in one's residence or abode"; (footnote added) *State* v. *Campbell*, supra, 300 Conn. 378; we nevertheless concluded that Campbell "would not be entitled to a jury instruction under the statute even if the common hallway of the dormitory constituted his abode because he was carrying a switchblade knife, which is prohibited irrespective of location." Id. In so concluding, we rejected Campbell's argument that "limiting the exceptions set forth in subparagraphs (D) and (E) of § 53-206 (b) (3) to long knives would be unworkable"; id., 379; concluding that, "[t]o the extent that any exception set forth in § 53-206 (b) would be unworkable if the person to whom it applied were not permitted to store the weapon in a convenient place or to transport the weapon so that it could be used for the permitted purpose . . . permission to do so is implicit in the exception. . . . Similarly, we conclude that an exception permitting an individual to carry a specific dangerous weapon for a particular purpose implicitly permits the individual to move the weapon with his or her household goods and to transport the weapon for purposes of repair. We conclude, therefore, that the exceptions set forth in § 53-206 (b) are workable without the existence of [a broad] implicit exception permitting the carrying of *any and all* dangerous weapons in one's residence or place of abode."[16] (Citations omitted; emphasis added; footnotes omitted.) Id., 379–80.

In *Campbell*, "[w]e emphasize[d] that this does not mean that an individual would be permitted to carry all of the dangerous weapons specified in § 53-206 (b) on his or her person in [his or her] residence or place of abode for other purposes. . . . For example, it does not follow from the fact that a martial arts student would be permitted to carry a martial arts weapon from his or her residence to a place of repair that the individual would be permitted as a general matter to carry the weapon in his or her residence. If that were the case, there would be no reason why an individual who was not a martial arts student should be prohibited from carrying a martial arts weapon in his or her residence. There is no indication, however, that the legislature was concerned with protecting a general sphere of privacy in the home, where individuals would be permitted to carry any dangerous weapon for any purpose they see fit. Rather, the clear purpose of the exceptions is to allow individuals to carry specific dangerous weapons for specific purposes and, to the extent that using the

weapon for the permitted purpose requires the individual to carry it for ancillary purposes such as transportation to the place of use or repair, to permit carrying the weapon for those purposes."[17] (Citation omitted; emphasis omitted.) Id., 380 n.6. Accordingly, we concluded that, because "the statute . . . recognizes no 'presumed lawful reason' for carrying a switchblade knife"; id., 381; Campbell was not "entitled to a jury instruction under the statute even if the common hallway of the dormitory constituted his abode because he was carrying a switchblade knife, which is prohibited irrespective of location." Id., 378.

Consistent with our construction of the moving exception of § 53-206 (b) (3) in *Campbell*, we conclude that the linguistically indistinguishable moving exception of § 29-38 (b) (5) (D) does not apply to the defendant's dirk knife or police baton, which, like switchblades, are items that are "prohibited [by statute] irrespective of location."[18] Id. The plain and unambiguous statutory language, coupled with our recent construction in *Campbell* of an identically worded provision in a related statute, gave the defendant fair warning that he was not permitted to use his motor vehicle to transport a dirk knife or police baton when, as in the present case, there is no other statutory exception that permits him to transport those items lawfully.[19] Accordingly, we conclude that § 29-38 (a) is not void for vagueness in the absence of our clarification of the moving exception in § 29-38 (b) (5) (D).

## II

### WHETHER § 29-38, AS APPLIED, VIOLATES THE SECOND AMENDMENT

We now turn to the defendant's claim, which is based on the United States Supreme Court's recent decisions in *McDonald* v. *Chicago*, 561 U.S. 742, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010), and *District of Columbia* v. *Heller*, 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008), that a construction of § 29-38 in accordance with our interpretation of § 53-206 in *State* v. *Campbell*, supra, 300 Conn. 378–80, that the moving exception is inapplicable to dirk knives and police batons, renders § 29-38 in violation of the second amendment to the United States constitution. The defendant further contends that, to save § 29-38 from constitutional infirmity, we should place a judicial gloss on § 29-38 to permit the possession of those items during the transportation of them from a former residence to a new residence.

In addressing the defendant's claims, we first must determine whether dirk knives and police batons constitute arms within the meaning of the second amendment. If we conclude that they are, we then must determine whether the statute's prohibition against transporting those weapons from one residence to another does not violate the defendant's rights under the second amend-

ment because the state has a sufficiently strong interest in enforcing such a prohibition. We address the parties' arguments on these points in turn.

A

Background

We begin with a brief review of the scope of the second amendment, as explained by the United States Supreme Court in its landmark decision in *District of Columbia* v. *Heller*, supra, 554 U.S. 570. In *Heller*, the United States Supreme Court was called on to determine the constitutionality of District of Columbia ordinances that broadly prohibited the possession of handguns, in the home and elsewhere; see id., 574–76; and also required citizens to "keep their lawfully owned firearms, such as registered long guns, 'unloaded and disassembled or bound by a trigger lock or similar device' unless they are located in a place of business or are being used for lawful recreational activities." Id., 575. In determining whether the second amendment confers an individual right to possess arms and, if so, the scope of such a right,[20] the court conducted an extensive textual and historical analysis of the second amendment, which provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. Upon examining the prefatory and operative clauses of the second amendment; see generally *District of Columbia* v. *Heller*, supra, 577–600; the court concluded that it "guarantee[s] the individual right to possess and carry weapons in case of confrontation."[21] Id., 592. The court observed, however, that this right is "not unlimited, just as the [f]irst [a]mendment's right of free speech [is] not . . . . Thus, [the court] do[es] not read the [s]econd [a]mendment to protect the right of citizens to carry arms for any sort of confrontation, just as [the court] do[es] not read the [f]irst [a]mendment to protect the right of citizens to speak for any purpose." (Citation omitted; emphasis omitted.) Id., 595. After considering the parameters of the second amendment right, the court held that it does protect the possession of "weapons . . . typically possessed by law-abiding citizens for lawful purposes"; id., 625; and does not protect "dangerous and unusual weapons." (Internal quotation marks omitted.) Id., 627. The court further concluded that the District of Columbia's firearms ordinances violated "the inherent right of self-defense [that] has been central to the [s]econd [a]mendment right. The handgun ban amounts to a prohibition of an entire class of arms that is overwhelmingly chosen by American society for that lawful purpose. The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute. Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred

firearm in the nation to keep and use for protection of one's home and family . . . would fail constitutional muster." (Citation omitted; footnote omitted; internal quotation marks omitted.) Id., 628–29.

Two years later, the United States Supreme Court considered whether the second amendment right to keep and bear arms is incorporated in the concept of due process and, therefore, applicable to the states via the fourteenth amendment. See *McDonald* v. *Chicago*, supra, 561 U.S. 750. The court in *McDonald* explained that its "decision in *Heller* points unmistakably to the answer. Self-defense is a basic right, recognized by many legal systems from ancient times to the present day, and, in *Heller*, [the court] held that individual self-defense is the central component of the [s]econd [a]mendment right." (Emphasis omitted; footnote omitted; internal quotation marks omitted.) Id., 767. Following a detailed historical analysis; see generally id., 768–77; the court concluded that the second amendment is applicable to the states because "the [f]ramers and ratifiers of the [f]ourteenth [a]mendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." Id., 778.

*Heller* aptly has been characterized as having adopted "a two-pronged approach to [s]econd [a]mendment challenges. First, [the court] ask[s] whether the challenged law imposes a burden on conduct falling within the scope of the [s]econd [a]mendment's guarantee. . . . If it does not, [the] inquiry is complete. If it does, [the court] evaluate[s] the law under some form of means-end scrutiny. If the law passes muster under that standard, it is constitutional. If it fails, it is invalid." (Citation omitted; footnote omitted.) *United States* v. *Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010), cert. denied, U.S. , 131 S. Ct. 958, 178 L. Ed. 2d 790 (2011); see also *United States* v. *Chovan*, 735 F.3d 1127, 1136–37 (9th Cir. 2013), cert. denied, U.S. , 135 S. Ct. 187, 190 L. Ed. 2d 146 (2014); *Kachalsky* v. *Westchester*, 701 F.3d 81, 93 (2d Cir. 2012), cert. denied sub nom. *Kachalsky* v. *Cacase*, U.S. , 133 S. Ct. 1806, 185 L. Ed. 2d 812 (2013). The appropriate degree of means-end scrutiny, generally some form of intermediate scrutiny, depends on the extent to which the challenged law burdens conduct protected under the second amendment.[22] See, e.g., *Kachalsky* v. *Westchester*, supra, 93; *Shew* v. *Malloy*, 994 F. Supp. 2d 234, 246–47 (D. Conn. 2014).

B

Whether Dirk Knives and Police Batons
Are Protected Arms Under
the Second Amendment

As we have explained, in evaluating the constitutionality of the statutory proscription against the transporta-

tion of dirk knives and police batons, we first must determine whether those weapons fall within the term "[a]rms" for purposes of the second amendment.[23] See, e.g., *United States* v. *Henry*, 688 F.3d 637, 640 (9th Cir. 2012) ("because we conclude that machine gun possession is not entitled to [s]econd [a]mendment protection, it is unnecessary to consider [the defendant's] argument that the [D]istrict [C]ourt applied the incorrect level of constitutional scrutiny in evaluating his claims"), cert. denied,      U.S.     , 133 S. Ct. 996, 184 L. Ed. 2d 773 (2013); *United States* v. *Marzzarella*, supra, 614 F.3d 94–95 (analyzing whether firearm with obliterated serial number is arm within meaning of second amendment). We are guided in that task by the United States Supreme Court's decision in *Heller*, which, beyond its broader holding that the second amendment protects the right of individuals to bear arms, also explains the contours of that right as it applies to the possession of particular weapons. More specifically, in determining that none of its prior precedents foreclosed a text based construction of the second amendment as an individual right,[24] the court reviewed at length its opinion in *United States* v. *Miller*, 307 U.S. 174, 59 S. Ct. 816, 83 L. Ed. 1206 (1939), in which the court had upheld "against a [s]econd [a]mendment challenge [a] federal indictment for [the transportation of] an unregistered short-barreled shotgun in interstate commerce, in violation of the National Firearms Act, [Pub. L. No. 474] 48 Stat. 1236 [1934]." *District of Columbia* v. *Heller*, supra, 554 U.S. 621–22; see *United States* v. *Miller*, supra, 176, 183. The court emphasized in *Heller* that *Miller* had concluded only that the short-barreled shotgun was a "type of weapon . . . not eligible for [s]econd [a]mendment protection: 'In the absence of any evidence tending to show that the possession or use of a [short-barreled shotgun] at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, [the court could not] say that the [s]econd [a]mendment guarantees the right to keep and bear such an instrument.' . . . 'Certainly,' the [c]ourt [in *Miller*] continued, 'it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense.' " (Citation omitted; emphasis omitted.) *District of Columbia* v. *Heller*, supra, 622, quoting *United States* v. *Miller*, supra, 178. The court emphasized that "*Miller* stands . . . for the proposition that the [s]econd [a]mendment right, whatever its nature, extends only to certain types of weapons."[25] *District of Columbia* v. *Heller*, supra, 623.

Significantly, however, for purposes of the present case, the court in *Heller* then articulated "what types of weapons *Miller* permits. Read in isolation, *Miller*'s phrase 'part of ordinary military equipment' could mean that only those weapons useful in warfare are protected. That would be a startling reading of the opinion, since

it would mean that the National Firearms Act's restrictions on machineguns (not challenged in *Miller*) might be unconstitutional, machineguns being useful in warfare in 1939. We think that *Miller*'s 'ordinary military equipment' language must be read in tandem with what comes after: '[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time.' . . . The traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense. 'In the colonial and revolutionary war era, [small-arms] weapons used by militiamen and weapons used in defense of person and home were one and the same.' . . . Indeed, that is precisely the way in which the [s]econd [a]mendment's operative clause furthers the purpose announced in its preface. We therefore read *Miller* to say only that the [s]econd [a]mendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." (Citations omitted; emphasis omitted.) Id., 624–25; see also *United States* v. *Miller*, supra, 307 U.S. 179–82 (discussing, inter alia, William Blackstone's *Commentaries on the Laws of England*, Adam Smith's *The Wealth of Nations*, and state statutes governing citizens' obligations to participate in militia and to supply weapons such as muskets or firelocks, ammunition, swords and bayonets).

The court further noted that this reading of *Miller*'s "important limitation" on the second amendment right finds "[support in] the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " *District of Columbia* v. *Heller*, supra, 554 U.S. 627. The court dismissed the potential objection "that if weapons that are most useful in military service—M-16 rifles and the like—may be banned, then the [s]econd [a]mendment right is completely detached from the prefatory clause. . . . [T]he conception of the militia at the time of the [s]econd [a]mendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty. It may well be true today that a militia, to be as effective as militias in the [eighteenth] century, would require sophisticated arms that are highly unusual in society at large. Indeed, it may be true that no amount of small arms could be useful against modern-day bombers and tanks. But the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change [the] interpretation of [that] right." Id., 627–28. Applying this analysis, the court held that the District of Columbia ordinances violated "the inherent right of self-defense [that] has been central to the [s]econd [a]mendment right," observing that the "handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for

that lawful purpose." Id., 628. With this background, we now address the issue of whether the dirk knife and police baton that the defendant had in his vehicle in violation of § 29-38 are "arms" within the scope of the second amendment, that is, whether they are weapons with traditional military utility that are "typically possessed by law-abiding citizens for lawful purposes"; id., 625; and not "dangerous and unusual weapons." (Internal quotation marks omitted.) Id., 627.

1

Dirk Knives

The state contends that dirk knives fall outside the scope of the second amendment because they "are not normally carried by private, law-abiding citizens for defense of hearth and home, and are not traditional military weapons." The state supports this argument with citations to a number of nineteenth century cases to which the court in *Heller* cites; see, e.g., *Aymette* v. *State*, 21 Tenn. (2 Hum.) 154, 158–59 (1840); *English* v. *State*, 35 Tex. 473, 477 (1871); *State* v. *Workman*, 35 W. Va. 367, 372–73, 14 S.E. 9 (1891); and several post-*Heller* cases, principally, an unpublished decision of the Massachusetts Appeals Court, *Commonwealth* v. *Alem A.*, Massachusetts Appeals Court, Docket No. 10-P-600 (Mass. App. December 5, 2011), review denied, 461 Mass. 1105, 961 N.E.2d 589 (2012), as well as *Norton* v. *South Portland*, 831 F. Supp. 2d 340, 362 (D. Me. 2011), *Mack* v. *United States*, 6 A.3d 1224, 1236 (D.C. 2010), and *Wooden* v. *United States*, 6 A.3d 833, 839–40 (D.C. 2010). As we explain hereinafter, however, these authorities are either distinguishable or otherwise unpersuasive in light of *Heller*; the more persuasive authority supports the conclusion that dirk knives constitute "arms," as the court in *Heller* explicated that term.

A particularly thorough and authoritative analysis of this issue is found in *State* v. *Delgado*, 298 Or. 395, 692 P.2d 610 (1984), a case in which the Oregon Supreme Court considered whether an Oregon state statute that "prohibit[ed] the mere possession and mere carrying of a switchblade knife" violated the right to bear arms under the Oregon constitution.[26] Id., 397. The court applied the historically based definition of the term "arms" that it previously had articulated in *State* v. *Kessler*, 289 Or. 359, 368, 614 P.2d 94 (1980)—a definitional approach that mirrors the model employed by the United States Supreme Court in *District of Columbia* v. *Heller*, supra, 554 U.S. 624–25, for purposes of the second amendment—observing that, "because settlers during the revolutionary era used many of the same weapons for both personal and military defense, the term 'arms,' as contemplated by the constitutional framers, was not limited to firearms but included those hand-carried weapons commonly used for personal defense. . . . Thus, the term 'arms' 'includes weapons com-

monly used for either purpose, even if a particular weapon is unlikely to be used as a militia weapon.' "[27] (Citation omitted.) *State* v. *Delgado*, supra, 399. The court further explained: "The appropriate inquiry in the case . . . is whether a kind of weapon, as modified by its modern design and function, is of the sort commonly used by individuals for personal defense during either the revolutionary and post-revolutionary era, or in 1859, when Oregon's constitution was adopted." (Footnote omitted.) Id., 400–401; see also id., 401 ("it must be determined whether the drafters would have intended the word 'arms' to include the [switchblade] knife as a weapon commonly used by individuals for [self-defense]").

After examining the centuries long evolution of the knife as a weapon used by military forces around the world; see id., 401–402; the court in *Delgado* explained that the switchblade knife was simply a technological improvement on folding knives such as military jack-knives and the "constant or enduring" pocketknife. Id., 402. Accordingly, the court concluded that, if the Oregon dangerous weapons statute "proscribed the possession of mere pocketknives, there can be no question but that the statute would be held to conflict directly with [a]rticle I, [§] 27 [of the Oregon constitution]. The only difference is the presence of the spring-operated mechanism that opens the knife." Id., 403. The court therefore invalidated the state's absolute prohibition on the possession of switchblade knives.[28] Id., 404. But see *Lacy* v. *State*, 903 N.E.2d 486, 491–92 (Ind. App.) (applying similar general historical analysis in post-*Heller* second amendment challenge to statutory ban on carrying switchblade knife but relying on case law and legislative history under federal law prohibiting, inter alia, interstate transportation of switchblade knives, 15 U.S.C. §§ 1241 through 1245, for proposition that "switchblades are primarily used by criminals and are not substantially similar to a regular knife or jack-knife," meaning that court could not "say that switchblades are typically possessed by law-abiding citizens for [self-defense] purposes"), transfer denied, 915 N.E.2d 991 (Ind. 2009).

Guided by the definition of the term "arms," as articulated in *District of Columbia* v. *Heller*, supra, 554 U.S. 624–25, and the analytical approach employed in both *Heller* and *State* v. *Delgado*, supra, 298 Or. 399–403, we examine the military origins and history of the dirk knife, starting with the fact that, as a general matter, fixed, long blade "[k]nives have long been part of American military equipment. The federal Militia Act of 1792 [c. 33, 1 Stat. 271] required all able-bodied free white men between [the ages of] eighteen and forty-five to possess, among other items, 'a sufficient bayonet.' This establishes both that knives were common and were arms for militia purposes. Colonial militia laws required that men (and sometimes all householders, regardless

of sex) own not only firearms but also bayonets or swords; the laws sometimes required [the] carrying [of] swords in [nonmilitia] situations, such as when going to church. In New England, the typical choice for persons required to own a bayonet or a sword was the sword because most militiamen fulfilled their legal obligation to possess a firearm by owning a 'fowling piece' (an ancestor to the shotgun, particularly useful for bird hunting), and these firearms did not have studs [on] which to mount a bayonet.

"Well after the nation's founding, knives continued to be an important tool for many American soldiers. During World War II, American soldiers, sailors, and airmen wanted and purchased fixed blade knives, often of considerable dimensions. At least in some units, soldiers were 'authorized an M3 trench knife, but many carried a favorite hunting knife.' The Marine Corps issued the Ka-Bar fighting knife. As one World War II memoir recounts, '[t]his deadly piece of cutlery was manufactured by the company bearing its name. The knife was [one] foot long with a [seven inch long] by [one and one-half inch wide] blade. . . . Light for its size, the knife was beautifully balanced.' Vietnam memoirs report that Ka-Bar and similar knives were still in use, but 'not [everyone was] issued a Ka-Bar knife. There [were] not enough to go around. If you [did not] have one, you [were forced to] wait until someone [was] going home from Vietnam and [gave] his to you.' Even today, some Special Forces units regularly carry combat knives." (Emphasis omitted; footnotes omitted.) D. Kopel et al., "Knives and the Second Amendment," 47 U. Mich. J.L. Reform 167, 192–93 (2013).

The history of dirk knives in particular is consistent with the American military usage of knives in general. "A dirk is a long straight-bladed dagger or short sword usually defined by comparison [to] the ceremonial weapons carried by Scottish highlanders and naval officers in the [e]ighteenth and [n]ineteenth [c]enturies." *Commonwealth* v. *Miller*, supra, 22 Mass. App. 695. In the 1700s, the Scottish brought the dirk to the Americas, where its design evolved from a knife with a handle grip overlapping a large single-edged blade, to a double-edged blade; after 1745, dirk blades "[q]uite frequently . . . were made from old sword blades." H. Peterson, supra, p. 19. As the dirk has evolved to be nearly synonymous with the dagger, the term became "appli[cable] to all the short side arms carried by naval officers," such that it came to include "true daggers and sharply curved knives almost of cutlass length." Id., p. 2; see also id., p. 95 (describing dirk as "[t]he most colorful of all the naval knives" and "[a] companion to and substitute for the sword"). The blade shape of dirks evolved during the nineteenth century from straight and double-edged to curved and then back to straight; all dirks featured large handles separated from the blade by prominent guards, or quillons. See id., pp. 96–101

(collecting photographs); see also E. Janes, supra, p. 67 (noting that dirk used in early nineteenth century had double-edged blade, becoming, "in fact, a short sword"). Indeed, as the naval dirk evolved over time to become the Ka-Bar fighting knife and other military issued combat knives—all of which look remarkably like the dirk knife at issue in the present case—the enhancements have included now common stabbing oriented features such as relatively long blades tapered to a sharp point, multiple edges, a handle with a hilt to protect the user's hand during thrusting, and thick grips. Compare H. Peterson, supra, pp. 100–101 (photographs of nineteenth century naval dirks), with id., pp. 108, 111 (describing and depicting Navy Mark 2 and Ka-Bar knives), and id., p. 109 (noting that naval Mark 2 knife was "only possible weapon" for use in defending against enemy frogmen during underwater demolition work).

As to whether dirk knives are " 'dangerous and unusual weapons' "; *District of Columbia* v. *Heller*, supra, 554 U.S. 627; and, therefore, not "arms" within the meaning of the second amendment, their more limited lethality relative to other weapons that, under *Heller*, fall squarely within the protection of the second amendment—e.g., handguns—provides strong support for the conclusion that dirk knives also are entitled to protected status. See D. Kopel et al., supra, 47 U. Mich. J.L. Reform 182–83 (citing empirical research demonstrating that, in 2010, knives or cutting instruments were used in 13.1 percent of United States murders, in comparison to firearms, which accounted for 67.5 percent, and that, in one state between 1978 and 1993, 39 percent of firearm penetrating traumas were fatal, compared to 7.1 percent of knife penetrating traumas); see also id., 182 ("[i]f handguns may not be prohibited, in spite of the clear public safety concerns, then a category of arm that is less dangerous clearly may not be prohibited, either"); E. Volokh, "Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda," 56 UCLA L. Rev. 1443, 1481–82 (2009) (suggesting that weapon is protected if it "is no more practically dangerous than what is in common use among law-abiding citizens"). This consideration, coupled with the fact that dirk knives bear a close relation to the bayonet and the sword, and have long been used for military purposes, removes them from the category of weapons that may be deemed dangerous and unusual, thereby rendering them subject to protection under the second amendment.[29] See, e.g., M. O'Shea, "The Right to Defensive Arms After *District of Columbia* v. *Heller*," 111 W. Va. L. Rev. 349, 377 (2009) ("after *Heller*, it appears indisputable that the 'arms' protected by the [s]econd [a]mendment include common defensive weapons other than firearms, such as knives and pepper spray"); cf. *People* v. *Yanna*, 297 Mich. App. 137, 145, 824 N.W.2d 241 (2012) ("*Heller* concluded that handguns are not sufficiently dangerous

to be banned. Tasers and stun guns, while plainly dangerous, are substantially less dangerous than handguns.").

Although the state cites to numerous authorities that, at first blush, might appear to support a contrary conclusion, a more careful review of these authorities reveals that they lack persuasive force. We turn first to its post-*Heller* authorities, most notably, *Commonwealth* v. *Alem A.*, supra, Massachusetts Appeals Court, Docket No. 10-P-600, which is directly on point insofar as it concluded that the second amendment, as elucidated by *Heller*, does not extend to a large, double-edged knife. Nevertheless, the Massachusetts Appeals Court designated its decision in *Alem A.* as unpublished and nonprecedential, presumably because its entire constitutional analysis consists of a single paragraph. Even that limited analysis is suspect in view of the court's reasoning that, because double-edged knives are deemed "dangerous" under the Massachusetts statute prohibiting the carrying of dangerous weapons, they are, ipso facto, " 'dangerous and unusual' " and, as a consequence, not protected under the second amendment. Id. *Alem A.* is wholly unpersuasive authority that we respectfully decline to follow.

The state's reliance on *Wooden* v. *United States*, supra, 6 A.3d 833, is misplaced because that case is readily distinguishable on procedural grounds. In *Wooden*, the District of Columbia Court of Appeals rejected a second amendment challenge to a conviction of carrying a dangerous weapon, in that case, an ordinary knife that the defendant, Stacia Wooden, had brought to an altercation with her husband's ex-girlfriend. See id., 834–35. The court in *Wooden*, however, emphasized that, because Wooden's claim was unpreserved, it would be considered only for plain error, which required her to establish that it was "clear or obvious" that she was entitled to prevail under *Heller*. Id., 835. In the context of this heightened showing required of Wooden, the court explained that, due to *Heller*'s focus on firearms, it could not "find it 'plain'— 'clear' or 'obvious'—that the [court in] *Heller* . . . would extend its ruling to knives carried *exclusively* for use as a dangerous weapon in self-defense. Absent the kind of historical analysis the [c]ourt applied to guns, *Heller* does not give [the court] the assurance necessary to find plain error in the . . . instructions [under the carrying a dangerous weapon statute] as applied to knives."[30] (Emphasis in original.) Id., 839–40. This circumscribed analysis significantly diminishes *Wooden*'s precedential value, especially because the court expressly declined to foreclose the possibility that, in a case in which the issue is properly preserved and briefed, it would recognize that the protections of the second amendment apply to the possession of knives. See id., 839 (observing that, "[p]erhaps a detailed *Heller*-type analysis would result in a conclu-

sion that some kinds of knives today—perhaps ordinary pocket knives or key chain knives, if not switchblades . . . may qualify for [s]econd [a]mendment protection" [footnotes omitted]); see also *Mack* v. *United States*, supra, 6 A.3d 1234–36 (following *Wooden* and rejecting plain error challenge to conviction for carrying dangerous weapon because court could not "say it [was] 'clear' or 'obvious' that the [s]econd [a]mendment secures the right of the people 'to keep and bear' ice picks," particularly outside of home).

Finally, the most venerable authorities on which the state relies, in particular, the nineteenth century cases of *Aymette* v. *State*, supra, 21 Tenn. (2 Hum.) 154, *English* v. *State*, supra, 35 Tex. 473, and *State* v. *Workman*, supra, 35 W. Va. 367, bear on the issue presented only insofar as they contributed to the general definition of protected weapon set forth in *District of Columbia* v. *Heller*, supra, 554 U.S. 624–25, and *United States* v. *Miller*, supra, 307 U.S. 178.[31] Beyond their definitional import, however, these state court decisions lack persuasive value because none of them acknowledges the military origins—and contemporaneous use—of the dirk knife; instead, they summarily classify the dirk knife with other weapons deemed to be particular to the criminal element, observing, inter alia, that the "terms dirks, daggers, slungshots, sword canes, brass knuckles and bowie knives, belong to no military vocabulary. Were a soldier on duty found with any of these things about his person, he would be punished for an offense against discipline." *English* v. *State*, supra, 477. Finally, the fact that all three of these cases classify the pistol as a weapon *not* protected by the second amendment; see *Aymette* v. *State*, supra, 159–60; *English* v. *State*, supra, 474–75; *State* v. *Workman*, supra, 373; renders them particularly anachronistic in light of *Heller*'s focus on the handgun as the paradigmatic protected weapon given its status as "the most preferred firearm in the nation to keep and use for protection of one's home and family . . . ."[32] (Citation omitted; internal quotation marks omitted.) *District of Columbia* v. *Heller*, supra, 554 U.S. 628–29; see also *Kachalsky* v. *Westchester*, supra, 701 F.3d 91 n.14 (noting that *English* and other such cases "were decided on the basis of an interpretation of the [s]econd [a]mendment—that pistols and similar weapons are not 'arms' within the meaning of the [s]econd [a]mendment or its state constitutional analogue—that conflicts with the [United States] Supreme Court's present reading of the [a]mendment").[33]

For these reasons, we agree with the defendant that, under *Heller*, the dirk knife that he was transporting to his new residence falls within the term "[a]rms" for purposes of the second amendment.[34] We therefore must decide whether the state's interest in prohibiting the defendant from possessing that weapon in his vehicle is sufficient to overcome the defendant's second

amendment rights. We first consider, however, whether the defendant's possession of the police baton also is subject to protection under the second amendment.

## 2

### Police Baton

In response to the defendant's contention that he had a second amendment right to have the police baton in his vehicle, the state contends that police batons are "dangerous and unusual" when possessed by persons not associated with law enforcement. In particular, the state points to the facts of the Rodney King case; see *Koon* v. *United States*, 518 U.S. 81, 86–87, 116 S. Ct. 2035, 135 L. Ed. 2d 392 (1996) (describing assault of King by police with, inter alia, police batons); as illustrative of the degree of physical injury that a police baton can cause. The state also relies on *People* v. *Brown*, 253 Mich. 537, 538, 541–43, 235 N.W. 245 (1931), and *State* v. *Workman*, supra, 35 W. Va. 373, for the proposition that blackjacks (*Brown*) and billies (*Workman*)—weapons of a similar nature to police batons—are unique to the criminal element and, consequently, are not protected under the second amendment. On the basis of more contemporary authority, including *State* v. *Kessler*, supra, 289 Or. 359, we agree with the defendant that police batons are "[a]rms" within the meaning of the second amendment because they are weapons with traditional military utility that are typically possessed by law-abiding citizens for lawful purposes, and they are neither especially dangerous nor unusual.

We begin with a brief discussion of *People* v. *Brown*, supra, 253 Mich. 537, in which the Michigan Supreme Court considered the defendant's claim that his conviction of carrying a dangerous weapon in an automobile predicated on his possession of a blackjack violated the state constitutional right to "bear arms for the defense of himself and the [s]tate." (Internal quotation marks omitted.) Id., 538, quoting Mich. Const. (1908), art. 2, § 5. After noting the restrictions on the scope of the state constitutional right to bear arms;[35] *People* v. *Brown*, supra, 541; the court observed that Michigan's dangerous weapons statute, which did "not include ordinary guns, swords, revolvers, or other weapons usually relied [on] by good citizens for defense or pleasure"; id., 542; was instead "a partial inventory of the arsenal of the 'public enemy,' the 'gangster.' It describes some of the particular weapons with which he [engages in warfare] on the [s]tate and reddens his murderous trail. The blackjack is properly included in the list of outlawed weapons. As defined in [one popular encyclopedia], it is . . . 'a bludgeonlike weapon consisting of a lead slug attached to a leather thong. The more carefully constructed [blackjacks] contain a spring within the handle which serves to ease the effect of the impact [on] the wrist of the [person] who wields the weapon. The blackjack has the reputation of being a characteris-

tic weapon of urban gangsters and rowdies.' " Id. The court therefore concluded that the statutory prohibition against blackjacks did not violate the defendant's state constitutional right to bear arms for self-defense. Id., 542–43; see also *State* v. *Swanton*, 129 Ariz. 131, 132, 629 P.2d 98 (App. 1981) (noting that then existing, pre-*Heller* case law did not extend second amendment protection to states, and concluding that defendant did not have right to possess nunchakus or nunchuks under Arizona constitution because "the term 'arms' as used [therein] means such arms as are recognized in civilized warfare and not those used by a ruffian, brawler or assassin"); *State* v. *Workman*, supra, 35 W. Va. 373 (observing that second amendment refers only to "weapons of warfare to be used by the militia, such as swords, guns, rifles, and muskets . . . and not to pistols, bowie-knives, brass knuckles, billies, and such other weapons as are usually employed in brawls, street-fights, duels and affrays").

In contrast, in *State* v. *Kessler*, supra, 289 Or. 359, the court considered the claim of the defendant, Randy Kessler, that his conviction of " 'possession of a slugging weapon,' " arising from his possession of two billy clubs in his apartment, violated his state constitutional right to bear arms. Id., 361, 370. Following a comprehensive analysis of the historical underpinnings of the provision of the Oregon constitution at issue, the court held that Kessler's possession of billy clubs in his apartment was constitutionally protected.[36] Id., 372. After observing that "[t]he club is considered the first personal weapon fashioned by humans"; id., 371; and "is still used today as a personal weapon, commonly carried by the police." Id., 371–72; see also id., 372 (noting statutory exception permitting peace officers to possess and carry blackjacks and billies); the court concluded that the drafters of the Oregon constitution "intended 'arms' to include the hand-carried weapons commonly used by individuals for personal defense. The club is an effective, hand-carried weapon [that] cannot logically be excluded from this term." Id., 372.

*Kessler* is more persuasive than *Brown* with respect to whether police batons fall within the protection of the second amendment. Perhaps most importantly, police batons simply are not the same as blackjacks, rendering *Brown* distinguishable in that important regard.[37] See *Commonwealth* v. *Perry*, 455 Mass. 1010, 1012, 916 N.E.2d 762 (2009) (" 'expandable baton' " not " 'blackjack' " for purpose of dangerous weapon statute). Indeed, in contrast to the blackjack, which, as we noted previously, has been characterized as a weapon used primarily for illegitimate purposes;[38] see, e.g., *People* v. *Brown*, supra, 253 Mich. 542; expandable metal police batons, also known as collapsible batons, are instruments manufactured specifically for law enforcement use as nonlethal weapons. Furthermore, the widespread use of the baton by the police, who currently perform

functions that were historically the province of the militia; see, e.g., D. Kopel, "The Second Amendment in the Nineteenth Century," 1998 BYU L. Rev. 1359, 1534; demonstrates the weapon's traditional military utility. Cf. *People* v. *Yanna*, supra, 297 Mich. App. 145–46 (noting that, because 95 percent of police departments nationwide use Tasers and stun guns, there is "no reason to doubt that the majority of Tasers and stun guns are used only for lawful purposes," and sustaining defendant's second amendment challenge to statute prohibiting ownership and possession of those devices in home); M. O'Shea, supra, 111 W. Va. L. Rev. 391–93 (suggesting examination of "[o]rdinary [p]olice [a]rms" issued to patrol officers by governments as illustrative of common use for second amendment analysis).

This widespread acceptance of batons within the law enforcement community also supports the conclusion that they are not so dangerous or unusual as to fall outside the purview of the second amendment. To this end, the fact that police batons are inherently less lethal, and therefore less dangerous and less intrinsically harmful, than handguns, which clearly constitute "arms" within the meaning of the second amendment, provides further reason to conclude that they are entitled to constitutional protection. Cf. *People* v. *Yanna*, supra, 297 Mich. App. 145 ("[T]he prosecution also argues that Tasers and stun guns are so dangerous that they are not protected by the [s]econd [a]mendment. However, it is difficult to see how this is so since *Heller* concluded that handguns are not sufficiently dangerous to be banned. Tasers and stun guns, while plainly dangerous, are substantially less dangerous than handguns. Therefore, [T]asers and stun guns do not constitute dangerous weapons for purposes of [s]econd [a]mendment inquiries."); D. Kopel et al., supra, 47 U. Mich. J.L. Reform 184 ("[K]nives are far less dangerous than guns. Any public safety justification for knife regulation is necessarily less persuasive than the public safety justification for firearms regulation."). Indeed, expandable batons are intermediate force devices that, when used as intended,[39] are unlikely to cause death or permanent bodily injury. For these reasons, we are persuaded that the police baton that the defendant had in his vehicle is the kind of weapon traditionally used by the state for public safety purposes and is neither so dangerous nor so unusual as to fall outside the purview of the second amendment's right to keep and bear arms.

C

Means-End Scrutiny of § 29-38

Finally, we must determine whether the statutory ban on the defendant's possession of the dirk knife and police baton in his vehicle for the purpose of transporting them to his new residence survives constitutional scrutiny. Our resolution of this issue requires us to evaluate the impact of this statutory restriction on

the "core" right identified in *District of Columbia* v. *Heller*, supra, 554 U.S. 630, namely, the right to possess certain arms in the home for the purpose of self-defense.[40] The defendant contends that § 29-38, as applied to his transportation of those weapons in the present case, so severely burdens his right to bear arms in his own home that the statutory restriction should be subjected to strict judicial scrutiny. Specifically, he argues that the statute's blanket prohibition against using a vehicle to transport a dirk knife and a police baton from one home to another makes it unreasonably difficult, if not impossible, to lawfully move those weapons to a new home. In such circumstances, the defendant asserts, § 29-38 impermissibly infringes on his second amendment rights because the complete statutory ban on transporting those protected weapons is insufficiently related to the state's concededly important interest in ensuring public safety. Finally, the defendant asserts that the only way to save § 29-38 from constitutional infirmity is for this court to engraft a moving exception onto that provision that is broader in scope than the existing exception, set forth in § 29-38 (b) (5) (D), which, as written, does not apply to dirk knives and police batons. See part I B of this opinion.

The state contends that, even if, as we have concluded, the dirk knife and police baton seized from the defendant's vehicle fall within the purview of the second amendment's right to keep and bear arms, heightened judicial scrutiny is inapplicable because § 29-38 does not constitute a substantial burden on rights guaranteed under the second amendment. The state argues, rather, that, because § 29-38 does not prohibit the use of a vehicle to transport certain other weapons from one residence to another, its infringement on second amendment rights is insignificant. For similar reasons, the state also asserts that, if heightened scrutiny is appropriate, intermediate, rather than strict, scrutiny should apply. The state further contends that the statute's ban on transporting "a few inherently dangerous weapons," including dirk knives and police batons—which, the state acknowledges, are illegal either to transport or to carry, without exception; see generally General Statutes §§ 29-38 and 53-206—survives intermediate scrutiny because it "employ[s] a reasonable means to meet the [substantial governmental interest in] promoting public safety on our streets" by "keeping dangerous and deadly weapons off [those] streets and out of cars." (Internal quotation marks omitted.) Although we reject the state's contention that the statutory ban on transporting dirk knives and police batons does not substantially burden the defendant's rights under the second amendment, we agree with the state that intermediate rather than strict scrutiny is the appropriate standard. We also conclude, however, that § 29-38, as applied to the facts of this case, does not survive that heightened level of constitutional review.

In *Heller*, the United States Supreme Court did not articulate the level of scrutiny applicable to laws that are found to restrict or burden second amendment rights, explaining that the District of Columbia's complete ban on possessing an operable firearm in the home failed constitutional muster under any standard. *District of Columbia* v. *Heller*, supra, 554 U.S. 628–29. The court did observe, however, that rational basis scrutiny would be inapplicable in view of the second amendment's status as an enumerated right. Id., 628 n.27.

Consistent with the approach that other federal circuit courts of appeals have adopted, the Second Circuit Court of Appeals has observed that, because of "*Heller*'s emphasis on the weight of the burden imposed by the [District of Columbia] gun laws, [the court does] not read [*Heller*] to mandate that any marginal, incremental or even appreciable restraint on the right to keep and bear arms be subject to heightened scrutiny. Rather, heightened scrutiny is triggered only by those restrictions that . . . operate as a substantial burden on the ability of law-abiding citizens to possess and use a firearm for self-defense (or for other lawful purposes)." *United States* v. *Decastro*, 682 F.3d 160, 166 (2d Cir. 2012), cert. denied, U.S. , 133 S. Ct. 838, 184 L. Ed. 2d 665 (2013); see also *Heller* v. *District of Columbia*, 670 F.3d 1244, 1257 (D.C. Cir. 2011) ("a regulation that imposes a substantial burden [on] the core right of self-defense protected by the [s]econd [a]mendment must have a strong justification"); *Ezell* v. *Chicago*, 651 F.3d 684, 708 (7th Cir. 2011) ("a severe burden on the core [s]econd [a]mendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end"); *United States* v. *Masciandaro*, 638 F.3d 458, 470 (4th Cir.) ("[a] severe burden on the core [s]econd [a]mendment right of armed self-defense should require strong justification" [internal quotation marks omitted]), cert. denied, U.S. , 132 S. Ct. 756, 181 L. Ed. 2d 482 (2011). Thus, if a statutory provision restricting the use of a particular weapon does not substantially burden conduct protected by the second amendment, the provision meets constitutional requirements without any further inquiry. E.g., *United States* v. *Decastro*, supra, 164–65 (concluding that, because federal gun control statute at issue "only minimally affects the ability to acquire a firearm, it is not subject to any form of heightened scrutiny"). Put differently, only if the "challenged law imposes a [substantial] burden on conduct falling within the scope of the [s]econd [a]mendment's guarantee . . . [does the court] evaluate [it] under some form of means-end [or heightened] scrutiny." *United States* v. *Marzzarella*, supra, 614 F.3d 89. Accordingly, we first must determine whether the statutory ban on using a vehicle to transport a dirk knife and a police baton from one home to another constituted a substantial burden on the defendant's sec-

ond amendment rights, thereby requiring heightened scrutiny of the regulatory scheme.[41]

Although neither the state nor the defendant has identified a case that is directly on point factually with the present one, it is evident that the prohibition against transporting a dirk knife and a police baton to a new home constitutes a significant restriction on the right to possess those weapons in that new home. Indeed, aside from an outright ban on possessing those weapons, it is difficult to conceive of a greater abridgement of that right than a restriction that bars the use of a vehicle to transport either of those weapons from one home to another. Moreover, under § 29-38, it is unlawful for an ordinary citizen, like the defendant, to transport those weapons from the place of purchase to the purchaser's home.[42] As a consequence, the statute's complete proscription against using a vehicle to transport the two protected weapons deprives their owner of any realistic opportunity either to bring them home after they have been purchased or to move them from one home to another. In fact, at oral argument before this court, the state acknowledged that, in light of that statutory prohibition, there may be no lawful means of doing either.[43] In contrast to other statutory schemes that have been found not to substantially burden second amendment rights; see, e.g., *United States* v. *Decastro*, supra, 682 F.3d 168 (prohibition of 18 U.S.C. § 922 [a] [3] on transporting into person's state of residence firearms acquired outside of state does not substantially burden second amendment rights because it neither "keep[s] someone from purchasing a firearm in [his or] her home state, which is presumptively the most convenient place to buy anything" nor "bar[s] purchases from an out-of-state supplier if the gun is first transferred to a licensed gun dealer in the purchaser's home state," and, therefore, there were "ample alternative means of acquiring firearms for self-defense purposes"); § 29-38's categorical ban on transporting dirk knives and police batons from one home to another operates as a significant infringement on the defendant's right to keep and bear arms in his home, such that heightened judicial scrutiny of that prohibition is warranted. See *Heller* v. *District of Columbia*, supra, 670 F.3d 1255, 1257 (court subjected firearm registration requirements to heightened scrutiny because they made "it considerably more difficult for a person lawfully to acquire and keep a firearm, including a handgun, for the purpose of self-defense in the home"); *United States* v. *Booker*, 644 F.3d 12, 25 (1st Cir. 2011) (statutory ban on possession of firearm by person convicted of misdemeanor crime of domestic violence implicates right to bear arms under second amendment and thereby triggers heightened scrutiny), cert. denied,     U.S.    , 132 S. Ct. 1538, 182 L. Ed. 2d 175 (2012); *United States* v. *Chester*, 628 F.3d 673, 681–82 (4th Cir. 2010) (same).

We also must determine, therefore, whether the statu-

tory ban on transporting dirk knives and police batons from a former residence to a current residence satisfies the appropriate level of means-end scrutiny. As a general matter, the applicable level of scrutiny depends on "how close the law comes to the core of the [s]econd [a]mendment right and the severity of the law's burden on the right." *Ezell* v. *Chicago*, supra, 651 F.3d 703; accord *Peruta* v. *San Diego*, 742 F.3d 1144, 1191 (9th Cir. 2014) (Thomas, J., dissenting); *Peterson* v. *Martinez*, 707 F.3d 1197, 1218 (10th Cir. 2013) (Lucero, J., concurring); see also *Heller* v. *District of Columbia*, supra, 670 F.3d 1257 (level of scrutiny applicable under second amendment "depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right" [internal quotation marks omitted]); *United States* v. *Chester*, supra, 628 F.3d 682 (same). "In analyzing the first prong of [this test, namely], the extent to which the law burdens the core of the [s]econd [a]mendment right, [the court relies] on *Heller*'s holding that the [s]econd [a]mendment has the core lawful purpose of self-defense, [*District of Columbia* v. *Heller*, supra, 554 U.S. 630], and that . . . [the primary interest protected by the second amendment is] the right of law-abiding, responsible citizens to use arms in defense of hearth and home. [Id., 635] . . . .

"In analyzing the second prong of [the test, namely], the extent to which a challenged prohibition burdens the [s]econd [a]mendment right . . . laws which regulate only the *manner* in which persons may exercise their [s]econd [a]mendment rights are less burdensome than those [that] bar firearm [or other weapon] possession completely. . . . [Thus] . . . regulations [that] leave open alternative channels for self-defense are less likely to place a severe burden on the [s]econd [a]mendment right than those [that] do not. Cf. [*United States* v.] *Marzzarella*, [supra, 614 F.3d 97] (applying intermediate scrutiny to a regulation [that] leaves a person free to possess any otherwise lawful firearm he chooses— [as] long as it bears its original serial number)." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Jackson* v. *San Francisco*, United States Circuit Court of Appeals, Docket No. 12-17803 (9th Cir. March 25, 2014).

The statutory restriction in the present case strikes close to the core protection of the second amendment because it erects a virtual bar to possessing certain protected weapons, including dirk knives and police batons, in the home for the purpose of self-defense. On the other hand, this restriction on the right to have those weapons in the home does not adversely affect an individual's ability to do the same with respect to a myriad of other weapons that fall within the purview of the second amendment. For example, under § 29-38 (a), any person may transport a pistol or revolver in a motor vehicle if that person has a proper permit, and § 29-38 (b) (4) permits the transportation by vehicle of

an unloaded BB. gun if it is stored in the trunk or kept in a locked container other than the glove compartment or console. Similarly, under § 29-38 (b) (5) (D), an individual may use a vehicle to transport a knife, the edged portion of the blade of which is four inches or more in length, for the purpose of removing one's household goods from one place to another. Indeed, as the state concedes, the defendant was entitled to use his car to transport his machetes, sword and long dragon knife to his new home. The availability of these and other options for possessing protected weapons in the home mitigates the adverse effect of the statutory prohibition against transporting dirk knives and police batons from one home to another.

Although the defendant advocates for the application of strict scrutiny, he does not support his argument with relevant case law applying that level of review in the second amendment context. In light of the nature and extent of the restrictions at issue in the present case, we agree with the state that intermediate scrutiny represents the applicable level of constitutional review. "[A]lthough addressing varied and divergent laws, courts throughout the country have nearly universally applied some form of intermediate scrutiny in the [s]econd [a]mendment context."[44] *New York State Rifle & Pistol Assn., Inc.* v. *Cuomo*, 990 F. Supp. 2d 349, 366 (W.D.N.Y. 2013).

Accordingly, we turn to the question of whether § 29-38, as applied to the facts of the present case, survives intermediate scrutiny. To establish that it does, the state must demonstrate that the absolute ban on transporting dirk knives and police batons is "substantially related to an important government objective." *Clark* v. *Jeter*, 486 U.S. 456, 461, 108 S. Ct. 1910, 100 L. Ed. 2d 465 (1988); see also *Kachalsky* v. *Westchester*, supra, 701 F.3d 96 ("[challenged law must be] substantially related to the achievement of an important governmental interest"). "In making this determination, substantial deference to the predictive judgments of [the legislature] is warranted. . . . The [United States] Supreme Court has long granted deference to legislative findings regarding matters that are beyond the competence of courts. . . . In the context of firearm [or weapon] regulation, the legislature is far better equipped than the judiciary to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms [or other weapons] and the manner to combat those risks. . . . Thus, [the court's] role is only to [ensure] that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence. . . . Unlike [with] strict scrutiny review, [the court is] not required to ensure that the legislature's chosen means [are] narrowly tailored or the least restrictive available means to serve the stated governmental interest. To survive intermediate scrutiny, the fit between the challenged regulation need

only be substantial, not perfect." (Citations omitted; internal quotation marks omitted.) *Kachalsky* v. *Westchester*, supra, 97; see also *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 160–61, 957 A.2d 407 (2008).

Nevertheless, to establish the requisite substantial relationship between the purpose to be served by the statutory provision and the means employed to achieve that end, the explanation that the state proffers in defense of the provision must be "exceedingly persuasive." (Internal quotation marks omitted.) *United States* v. *Virginia*, 518 U.S. 515, 533, 116 S. Ct. 2264, 135 L. Ed. 2d 735 (1996). Moreover, "[t]he justification must be genuine, not hypothesized or invented post hoc in response to litigation. And it must not rely on overbroad generalizations . . . ." Id. The reason for this requirement is to ensure "that the validity of [the challenged statute] is determined through reasoned analysis rather than through the mechanical application of traditional, often inaccurate, assumptions." (Internal quotation marks omitted.) *State* v. *Dyous*, 307 Conn. 299, 318, 53 A.3d 153 (2012). "[I]n judging the closeness of the relationship between the means chosen . . . and the government's interest, three interrelated concepts must be considered: the factual premises [that] prompted the legislative enactment, the logical connection between the remedy and those factual premises, and the breadth of the remedy chosen." (Internal quotation marks omitted.) Id., 327.

Post-*Heller* case law supports the commonsense conclusion that the core right to possess a protected weapon in the home for self-defense necessarily entails the right, subject to reasonable regulation, to engage in activities necessary to enable possession in the home.[45] Thus, the safe transportation of weapons protected by the second amendment is an essential corollary of the right to possess them in the home for self-defense when such transportation is necessary to effectuate that right.[46] Conversely, in rejecting second amendment challenges to measures prohibiting the possession of handguns outside the home, courts have deemed it significant that those regulatory schemes contained provisions including, in addition to the right to possess handguns in the home, limited exceptions permitting the transportation of handguns between homes, or between home and dealer or repairer.[47]

We conclude that the state has not provided sufficient reason for extending the ban on transporting dirk knives and police batons to a scenario, like the present one, in which the owner of those weapons uses his vehicle to move them from a former residence to a new one. Indeed, the state has proffered no such justification; it relies, rather, on the assertion that § 29-38 "substantially furthers its public safety objective by imposing a permit requirement on having pistols and revolvers in the car

and by identifying a few inherently dangerous weapons, among them a dirk knife and a police baton, that are illegal to carry or transport under any circumstances." Section 29-38 contains a variety of limited exceptions, however, permitting the transportation of other weapons that the legislature also has determined to be dangerous, and some of those exceptions pertain to weapons that are significantly more lethal than dirk knives and police batons, such as handguns and long knives, including machetes and swords. This fact defeats any claim that a similarly limited exception allowing the transportation of dirk knives and police batons from one home to another would frustrate or impede the concededly compelling governmental interest of ensuring the safety of the public and police officers. See, e.g., *United States* v. *Marzzarella*, supra, 614 F.3d 99 ("[i]f a regulation fails to cover a substantial amount of conduct implicating the asserted compelling interest, its underinclusiveness can be evidence that the interest is not significant enough to justify the regulation"). As those existing exceptions demonstrate, the legislature is fully capable of adopting reasonable regulatory measures, in the interest of public safety, short of a ban on transporting dirk knives and police batons from one residence to another, while also accommodating the defendant's second amendment right to keep those weapons in the home for self-defense. See, e.g., *Commonwealth* v. *Reyes*, 464 Mass. 245, 256–57, 982 N.E.2d 504 (2013) (rejecting second amendment challenge to statute requiring that firearm kept in motor vehicle be stored in locked container or be equipped with mechanical lock or other safety device). As written, however, § 29-38 is not substantially related to that public safety interest because its ban on transporting dirk knives and police batons extends unnecessarily to conduct that is entitled to second amendment protection.[48] The defendant has established, therefore, that his conviction under § 29-38 (a) for using his Jeep to transport a dirk knife and police baton to his new residence violated his second amendment right to keep and bear arms. Consequently, his conviction cannot stand.

We turn, then, to the appellate remedy. "It is well established that this court has a duty to construe statutes, whenever possible, to avoid constitutional infirmities . . . . [W]hen called [on] to interpret a statute, we will search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent. . . . This principle directs us to search for a judicial gloss . . . that will effect the legislature's will in a manner consistent with constitutional safeguards." (Citations omitted; internal quotation marks omitted.) *State* v. *Cook*, 287 Conn. 237, 245, 947 A.2d 307, cert. denied, 555 U.S. 970, 129 S. Ct. 464, 172 L. Ed. 2d 328 (2008); see also, e.g., *State* v. *Indrisano*, 228 Conn. 795, 805, 640 A.2d 986 (1994) ("we may also add interpretive gloss to a challenged statute in order

to render it constitutional" [internal quotation marks omitted]). In the present case, however, even if we were to place a gloss on § 29-38 to save it from constitutional infirmity by excepting from its purview the transportation of protected weapons, including dirk knives and police batons, from one residence to another, the state has conceded that that is what the defendant was doing when he was found to have those weapons in his vehicle. As a result, placing such a gloss on § 29-38 would not provide the state with a lawful means of establishing that the defendant's possession of the dirk knife and police baton in his vehicle violated § 29-38.

Furthermore, we already have determined that § 29-38 plainly does *not* except such conduct from its reach. See part I B of this opinion. We previously have declined to place a gloss on a statute that contradicts its plain meaning; *Keller* v. *Beckenstein*, 305 Conn. 523, 536–37, 46 A.3d 102 (2012); and we see no reason to do so in the present case. Indeed, following such an approach would be incompatible with the principle that it is appropriate to place a judicial gloss on a statutory provision only if that gloss comports with the legislature's underlying intent. See *State* v. *Cook*, supra, 287 Conn. 245. When, as in the present case, however, such a gloss is not consistent with the intent of the legislature as expressed in the clear statutory language, we will not rewrite the statute so as to render it constitutional. Thus, because § 29-38 is unconstitutional as applied to the facts of this case, the defendant is entitled to a judgment of acquittal on both of the charges for which he was convicted.

Finally, we wish to emphasize that our holding is a narrow one and that the legislature is free to regulate the carrying and transportation of all weapons, including, of course, dirk knives and police batons, in the interest of public safety. Nothing in this opinion is meant to limit that broad regulatory authority, except insofar as the legislature may seek to use that authority in a manner that cannot be squared with the rights protected by the second amendment. Because the existing statutory scheme places an undue burden on the defendant's right to possess and keep his dirk knife and police baton in his home by making it impossible for him to transport those weapons there, that scheme does not pass constitutional muster as applied to the defendant's conduct in the present case.

The judgment is reversed and the case is remanded with direction to render judgment of acquittal on both counts of having a weapon in a motor vehicle.

In this opinion the other justices concurred.

[1] General Statutes (Rev. to 2009) § 29-38 provides: "(a) Any person who knowingly has, in any vehicle owned, operated or occupied by such person, any weapon, any pistol or revolver for which a proper permit has not been issued as provided in section 29-28 or any machine gun which has not been registered as required by section 53-202, shall be fined not more than one thousand dollars or imprisoned not more than five years or both, and the

presence of any such weapon, pistol or revolver, or machine gun in any vehicle shall be prima facie evidence of a violation of this section by the owner, operator and each occupant thereof. The word 'weapon', as used in this section, means any BB. gun, any blackjack, any metal or brass knuckles, any police baton or nightstick, any dirk knife or switch knife, any knife having an automatic spring release device by which a blade is released from the handle, having a blade of over one and one-half inches in length, any stiletto, any knife the edged portion of the blade of which is four inches or over in length, any martial arts weapon or electronic defense weapon, as defined in section 53a-3, or any other dangerous or deadly weapon or instrument.

"(b) The provisions of this section shall not apply to: (1) Any officer charged with the preservation of the public peace while engaged in the pursuit of such officer's official duties; (2) any security guard having a baton or nightstick in a vehicle while engaged in the pursuit of such guard's official duties; (3) any person enrolled in and currently attending a martial arts school, with official verification of such enrollment and attendance, or any certified martial arts instructor, having any such martial arts weapon in a vehicle while traveling to or from such school or to or from an authorized event or competition; (4) any person having a BB. gun in a vehicle provided such weapon unloaded and stored in the trunk of such vehicle or in a locked container other than the glove compartment or console; and (5) any person having a knife, the edged portion of the blade of which is four inches or over in length, in a vehicle if such person is (A) any member of the armed forces of the United States, as defined in section 27-103, or any reserve component thereof, or of the armed forces of the state, as defined in section 27-2, when on duty or going to or from duty, (B) any member of any military organization when on parade or when going to or from any place of assembly, (C) any person while transporting such knife as merchandise or for display at an authorized gun or knife show, (D) any person while lawfully removing such person's household goods or effects from one place to another, or from one residence to another, (E) any person while actually and peaceably engaged in carrying any such knife from such person's place of abode or business to a place or person where or by whom such knife is to be repaired, or while actually and peaceably returning to such person's place of abode or business with such knife after the same has been repaired, (F) any person holding a valid hunting, fishing or trapping license issued pursuant to chapter 490 or any salt water fisherman while having such knife in a vehicle for lawful hunting, fishing or trapping activities, or (G) any person participating in an authorized historic reenactment."

All references in this opinion to § 29-38 are to the 2009 revision unless otherwise noted.

[2] The defendant suffered a traumatic brain injury as the result of a mine explosion while serving overseas in Kosovo. He testified that this prior injury exacerbated any subsequent head trauma, including the trauma that he suffered as a result of the automobile accident on July 22, 2010.

[3] The jury apparently agreed with the defendant's contention that he was transporting the two machetes, the dragon knife and the sword in accordance with the moving exception of § 29-38 (b) (5) (D). See footnote 1 of this opinion. It is this finding by the jury that provides the basis for the state's concession that the defendant also was transporting the dirk knife and police baton from his former residence to his new residence.

[4] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[5] We note that the state and the defendant agree that there is no statutory prohibition against owning a dirk knife or a police baton and storing the weapon in one's home. As we explain more fully hereinafter, however; see part I B of this opinion; in *State* v. *Campbell*, 300 Conn. 368, 378–80, 13 A.3d 661 (2011), this court construed General Statutes § 53-206, which prohibits a person from carrying certain enumerated dangerous weapons, as prohibiting the possession of certain weapons, including dirk knives and police batons, either inside or outside the home. Moreover, § 29-38 expressly prohibits the possession of either weapon in a vehicle.

[6] The defendant also raises a claim of instructional impropriety predicated on the contention that the trial court's jury instructions were inadequate to preserve his second amendment rights. In view of our conclusion that, under the facts of this case, the defendant's conviction for transporting the dirk knife and police baton is unconstitutional under the second amendment, we need not address the defendant's instructional claim.

[7] California Penal Code § 16470 (Deering 2012) provides: "As used in this part, 'dirk' or 'dagger' means a knife or other instrument with or without a handguard that is capable of ready use as a stabbing weapon that may inflict great bodily injury or death. A nonlocking folding knife, a folding knife that is not prohibited by Section 21510, or a pocketknife is capable of ready use as a stabbing weapon that may inflict great bodily injury or death only if the blade of the knife is exposed and locked into position." We note that the defendant cites Cal. Penal Code § 12020 (c) (24) (Deering 2008), which was transferred, without substantive change, to Cal. Penal Code § 16470 in 2012.

[8] General Statutes § 53-206 provides: "(a) Any person who carries upon his or her person any BB. gun, blackjack, metal or brass knuckles, or any dirk knife, or any switch knife, or any knife having an automatic spring release device by which a blade is released from the handle, having a blade of over one and one-half inches in length, or stiletto, or any knife the edged portion of the blade of which is four inches or more in length, any police baton or nightstick, or any martial arts weapon or electronic defense weapon, as defined in section 53a-3, or any other dangerous or deadly weapon or instrument, shall be fined not more than five hundred dollars or imprisoned not more than three years or both. Whenever any person is found guilty of a violation of this section, any weapon or other instrument within the provisions of this section, found upon the body of such person, shall be forfeited to the municipality wherein such person was apprehended, notwithstanding any failure of the judgment of conviction to expressly impose such forfeiture.

"(b) The provisions of this section shall not apply to (1) any officer charged with the preservation of the public peace while engaged in the pursuit of such officer's official duties; (2) the carrying of a baton or nightstick by a security guard while engaged in the pursuit of such guard's official duties; (3) the carrying of a knife, the edged portion of the blade of which is four inches or more in length, by (A) any member of the armed forces of the United States, as defined in section 27-103, or any reserve component thereof, or of the armed forces of the state, as defined in section 27-2, when on duty or going to or from duty, (B) any member of any military organization when on parade or when going to or from any place of assembly, (C) any person while transporting such knife as merchandise or for display at an authorized gun or knife show, (D) any person who is found with any such knife concealed upon one's person while lawfully removing such person's household goods or effects from one place to another, or from one residence to another, (E) any person while actually and peaceably engaged in carrying any such knife from such person's place of abode or business to a place or person where or by whom such knife is to be repaired, or while actually and peaceably returning to such person's place of abode or business with such knife after the same has been repaired, (F) any person holding a valid hunting, fishing or trapping license issued pursuant to chapter 490 or any salt water fisherman carrying such knife for lawful hunting, fishing or trapping activities, or (G) any person while participating in an authorized historic reenactment; (4) the carrying by any person enrolled in or currently attending, or an instructor at, a martial arts school of a martial arts weapon while in a class or at an authorized event or competition or while transporting such weapon to or from such class, event or competition; (5) the carrying of a BB. gun by any person taking part in a supervised event or competition of the Boy Scouts of America or the Girl Scouts of America or in any other authorized event or competition while taking part in such event or competition or while transporting such weapon to or from such event or competition; and (6) the carrying of a BB. gun by any person upon such person's own property or the property of another person provided such other person has authorized the carrying of such weapon on such property, and the transporting of such weapon to or from such property."

[9] By way of example, the defendant cites to the fourth edition of Webster's New World Dictionary which, he asserts, defines "baton" as "a staff serving as a symbol of office," "a slender stick used in directing music," "a metal rod twirled by a drum major," and "a short, light rod used in relay races."

[10] Other definitions of the term "baton" are: "a staff borne as a symbol of office," "a narrow heraldic bend," "a slender rod with which a leader directs a band or orchestra," "a hollow cylinder carried by each member of a relay team and passed to the succeeding runner," and "a hollow metal rod with a weighted bulb at one or both ends that is flourished or twirled by a drum major or drum majorette . . . ." Merriam-Webster's Collegiate Dictionary, supra, p. 103. Although the dictionary on which the defendant relies provides only these definitions and contains no mention of a police baton; see footnote 9 of this opinion; that dictionary is a more general reference source that lacks the comprehensive coverage of dictionaries that ordinarily are more appropriate for use in accordance with § 1-1.

[11] In 1999, the legislature amended General Statutes (Rev. to 1999) § 29-38 and General Statutes (Rev. to 1999) § 53-206 to include within their purview "any police baton or nightstick . . . ." Public Acts 1999, No. 99-212, §§ 12 and 14 (P.A. 99-212). The only commentary in the legislative history with respect to this portion of P.A. 99-212 was a colloquy during the debate in the House of Representatives between Representatives Ronald S. San Angelo and Michael P. Lawlor clarifying that a police officer may possess his or her nightstick or police baton at home because the statutory exception for law enforcement "also encompasses when [a police officer is] at home. [As] long as he was not using those dangerous weapons in any fashion that was inconsistent with his official duties, either on duty or off duty, that would be okay." 42 H.R. Proc., Pt. 15, 1999 Sess., p. 5454, remarks of Representative San Angelo.

[12] The defendant testified at trial that the baton seized from his vehicle is a metal extension tube that he had used as an army medic for splinting leg fractures. Nevertheless, as with the dirk knife, whether the state established that the item at issue was a prohibited police baton gave rise to a question of fact for the jury; see, e.g., *Richards* v. *Commonwealth*, supra, 18 Va. App. 246 n.2; cf. *State* v. *Wilchinski*, supra, 242 Conn. 228; and the defendant makes no claim that the evidence was insufficient to support the jury's finding that he had a police baton in his vehicle in violation of § 29-38 (a). We also note that the mere fact that someone uses a prohibited weapon in a manner other than that for which it is manufactured would not alter the classification of the item.

[13] See footnote 8 of this opinion.

[14] See *State* v. *Campbell*, 116 Conn. App. 440, 445 n.3, 975 A.2d 757 (2009) ("the [trial] court [improperly] characterized the residence or place of abode exception as the second element of the crime" under § 53-206 [b] because "[t]he claim that a defendant is within his residence or place of abode while possessing the weapon is a defense to the crime of carrying a dangerous weapon, not an element"), aff'd, 300 Conn. 368, 13 A.3d 661 (2011); see also *State* v. *Valinski*, 254 Conn. 107, 125, 756 A.2d 1250 (2000) ("the state must disprove an exception to culpability as an element of the crime when charging the defendant under a statute in which that exception is located within the enacting or prohibiting clause . . . whereas the defendant bears the burden of persuasion if the exception is not found within the enacting or prohibiting clause" [citation omitted]).

[15] In *State* v. *Sealy*, supra, 208 Conn. 689, we upheld the conviction of the defendant, Anthony Sealy, of carrying a dangerous weapon in violation of General Statutes (Rev. to 1985) § 53-206 (a), arising from Sealy's possession of a butcher knife with a blade that was four and one-half inches long in the common hallway of a small apartment building in which he resided. Id., 691, 696. We rejected Sealy's claim, predicated on the moving exception of that provision, that the trial court improperly had instructed the jury that "[General Statutes (Rev. to 1985)] § 53-206 (a) would be violated if [Sealy] had the knife outside his apartment in a common area." Id., 692. Examining the statutory moving exception in General Statutes (Rev. to 1985) § 53-206 (a), we observed that "[i]mplicit in this provision is an exception for carrying a weapon in an individual's residence or abode, and a recognition of the protected zone of privacy in his or her dwelling." Id., 693; see also id., 693 n.2 (noting that "General Statutes [Rev. to 1985] § 53-206 [a] does not expressly except from its terms the carrying of a dangerous weapon in one's dwelling or abode" but that it was "an implied exception"). The court, however, applied search and seizure privacy principles to the facts of the case and rejected Sealy's argument that "his exclusive use and control over this area rendered the landing and stairway part of his residence and, therefore, [that] his carrying a weapon in this area was exempt from the operation of [General Statutes (Rev. to 1985)] § 53-206 (a)." Id., 693.

[16] In support of his claim that limiting the exceptions of subparagraphs (D) and (E) of § 53-206 (b) (3) to long knives would be unworkable, Campbell relied on the martial arts exception set forth in § 53-206 (b) (4), arguing that that exception, which "permits 'the carrying by any person enrolled in or currently attending, or an instructor at, a martial arts school of a martial arts weapon while in a class or at an authorized event or competition or while transporting such weapon to or from such class, event or competition' . . . would be meaningless if such a person could not carry a martial arts weapon at home." *State* v. *Campbell*, supra, 300 Conn. 379. In rejecting Campbell's claim that the exceptions of subparagraphs (D) and (E) of § 53-206 (b) (3) would be unworkable if applied only to long knives, we construed the exceptions set forth in § 53-206 (b), including the martial arts exception,

as implicitly permitting the storing and carrying of that weapon insofar as it was necessary to do so to ensure that the exception would not be rendered unworkable or meaningless. See id., 379–80. Thus, by way of example, we explained that "a martial arts student who carried a martial arts weapon [on] his or her person while transporting it to and from classes or other events, but kept the weapon stored at home, would not be violating the statute." Id., 379.

[17] It is important to note, however, that, in *Campbell*, we declined to address Campbell's claim on appeal that the implicit abode exception that we recognized in *State* v. *Sealy*, supra, 208 Conn. 693, was constitutionally required, explaining that, "[t]o the extent that [Campbell] claims that § 53-206 is unconstitutional as applied to persons who carry dangerous weapons in their residence or place of abode, the claim was not preserved before the trial court, and [Campbell] has not sought review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Accordingly, we decline to review it." (Footnote omitted.) *State* v. *Campbell*, supra, 300 Conn. 382.

[18] As we explain more fully hereinafter; see part II of this opinion; although we stated in *Campbell* that, under § 53-206, the legislature has prohibited the carrying of certain weapons even in the home; see *State* v. *Campbell*, supra, 300 Conn. 378; that prohibition may violate the second amendment depending on the weapon at issue.

[19] The defendant explains that he was an active member of the military at the time of his arrest, and that he was taking martial arts classes, as well. We agree with the state, however, that, pursuant to *Campbell*, this evidence is irrelevant to our analysis because neither of the exceptions in § 29-38 (b) that are applicable to military service or to the performance of martial arts pertains to dirk knives or police batons.

[20] The court in *Heller* observed that the parties "set out very different interpretations of the [second] [a]mendment. [The] [p]etitioners . . . [posited] that it protects only the right to possess and carry a firearm in connection with militia service. . . . [The] [r]espondent argue[d] that it protects an individual right to possess a firearm unconnected with service in a militia, and to use that arm for traditionally lawful purposes, such as self-defense within the home." (Citations omitted.) *District of Columbia* v. *Heller*, supra, 554 U.S. 577.

[21] The court emphasized that its reading of the operative clause in this manner was consistent with the prefatory clause, observing that: "It is therefore entirely sensible that the [s]econd [a]mendment's prefatory clause announces the purpose for which the right was codified: to prevent elimination of the militia. The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting. But the threat that the new [f]ederal [g]overnment would destroy the citizens' militia by taking away their arms was the reason that right—unlike some other English rights—was codified in a written [c]onstitution." *District of Columbia* v. *Heller*, supra, 554 U.S. 599.

[22] This second amendment analysis has its origins in the United States Supreme Court's first amendment jurisprudence, pursuant to which certain speech is unprotected, and varying degrees of judicial scrutiny are applied to speech depending on the nature of the speech at issue. See, e.g., *Ezell* v. *Chicago*, 651 F.3d 684, 702 (7th Cir. 2011); *United States* v. *Chester*, 628 F.3d 673, 682 (4th Cir. 2010).

[23] Beyond certain weapons themselves, the court in *Heller* also placed outside the protection of the second amendment other "longstanding prohibitions" on firearms possession, emphasizing that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *District of Columbia* v. *Heller*, supra, 554 U.S. 626–27; see also id., 627 n.26 (describing such proscriptions as "presumptively lawful regulatory measures only as examples; [the] list does not purport to be exhaustive"). These prohibitions have been characterized as "exceptions to the right to bear arms." *United States* v. *Marzzarella*, supra, 614 F.3d 91; see also *United States* v. *Rozier*, 598 F.3d 768, 771 (11th Cir.) (concluding that felons are "disqualified from the exercise of [s]econd [a]mendment rights [under *Heller*]" [internal quotation marks omitted]), cert. denied, 560 U.S. 958, 130 S. Ct. 3399, 177 L. Ed. 2d 313 (2010); *United States* v. *Vongxay*, 594 F.3d 1111, 1115 (9th Cir.) (person maintains right to possess firearm in home for self-defense, provided he is "not disqualified from the exercise of [s]econd

[a]mendment rights" [internal quotation marks omitted]), cert. denied, U.S.      , 131 S. Ct. 294, 178 L. Ed. 2d 193 (2010).

[24] For example, in explaining the meaning of the word "arms," the United States Supreme Court noted that "[t]he term was applied, then as now, to weapons that were not specifically designed for military use and were not employed in a military capacity"; *District of Columbia* v. *Heller*, supra, 554 U.S. 581; observing that, "[a]lthough one founding-era thesaurus limited 'arms' (as opposed to 'weapons') to 'instruments of offence generally made use of in war,' even that source stated that all firearms constituted 'arms.'" Id.; see also id., 582 (rejecting as "bordering on the frivolous" argument "that only those arms in existence in the [eighteenth] century are protected by the [s]econd [a]mendment," and concluding that "the [s]econd [a]mendment [on its face] extends . . . to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding").

[25] Indeed, in *Heller*, the court emphasized that *Miller*'s "holding is not only consistent with, but positively suggests, that the [s]econd [a]mendment confers an individual right to keep and bear arms (though only arms that 'have some reasonable relationship to the preservation or efficiency of a well regulated militia'). Had the [c]ourt [in *Miller*] believed that the [s]econd [a]mendment protects only those serving in the militia, it would have been odd to examine the character of the weapon rather than simply note that the two crooks were not militiamen." *District of Columbia* v. *Heller*, supra, 554 U.S. 622.

[26] The Oregon state constitution provides in relevant part: "The people shall have the right to bear arms for the defence of themselves, and the State . . . ." Or. Const., art. I, § 27.

[27] Consistent with the analysis of the United States Supreme Court in *Heller*, the Oregon Supreme Court in *Kessler* explained: "In the colonial and revolutionary war era, weapons used by militiamen and weapons used in defense of person and home were one and the same. A colonist usually had only one gun [that] was used for hunting, protection, and militia duty, plus a hatchet, sword, and knife. . . . When the revolutionary war began, the colonists came equipped with their hunting muskets or rifles, hatchets, swords, and knives. The colonists suffered a severe shortage of firearms in the early years of the war, so many soldiers had to rely primarily on swords, hatchets, knives, and pikes (long staffs with a spear head). . . .

"Therefore, the term 'arms' as used by the drafters of the constitutions probably was intended to include those weapons used by settlers for both personal and military defense. The term 'arms' was not limited to firearms, but included several [hand-carried] weapons commonly used for defense. The term 'arms' would not have included [a] cannon or other heavy ordnance not kept by militiamen or private citizens." (Citations omitted.) *State* v. *Kessler*, supra, 289 Or. 368. Noting the impact of advances in technology on the development of weaponry, the court emphasized that, "[w]hen the constitutional drafters referred to an individual's 'right to bear arms,' the arms used by the militia and for personal protection were basically the same weapons. Modern weapons used exclusively by the military are not 'arms' [that] are commonly possessed by individuals for defense, [and] therefore, the term 'arms' in the [Oregon] constitution does not include such weapons." Id., 369; see also id. ("advanced weapons of modern warfare have never been intended for personal possession and protection"). After observing that the state constitutional provision at issue expressly "guarantees a right to bear arms for defense of themselves, and the [s]tate"; (internal quotation marks omitted) id.; the court further emphasized that the "term 'arms' in [the Oregon] constitution therefore would include weapons commonly used for either purpose, even if a particular weapon is unlikely to be used as a militia weapon." Id. Accordingly, the court held in *Kessler* that the state was constitutionally barred from prohibiting the possession of a billy club in the home because the court's "historical analysis of [a]rticle I, [§] 27, [of the Oregon constitution] indicates that the drafters intended arms to include the hand-carried weapons commonly used by individuals for personal defense. The club is an effective, hand-carried weapon [that] cannot logically be excluded from this term." (Internal quotation marks omitted.) Id., 372.

[28] The court emphasized, however, that its "decision does not mean [that] individuals have an unfettered right to possess or use constitutionally protected arms in any way they please. The legislature may, if it chooses to do so, regulate possession and use. . . . [The] court recognizes the seriousness with which the legislature views the possession of certain weapons, especially [switchblades]. The problem here is that [Oregon's dangerous weapons statute] absolutely proscribes the mere possession or carrying of

such arms. This the [Oregon] constitution does not permit." (Citations omitted; footnote omitted.) *State* v. *Delgado*, supra, 298 Or. 403–404.

[29] We note that several other jurisdictions, in relatively recent cases, have addressed constitutional challenges to particular restrictions on the carrying or possession of fixed blade knives. They have done so, however, without first deciding whether the knife at issue fell within the meaning of the term "arms" for purposes of the second amendment (or its state constitutional analogue) because they assumed, either explicitly or implicitly, that it did before considering whether the scope of the restriction at issue could withstand the appropriate level of state or federal constitutional scrutiny. See *Norton* v. *South Portland*, supra, 831 F. Supp. 2d 362; *People* v. *Mitchell*, 209 Cal. App. 4th 1364, 1375–76, 148 Cal. Rptr. 3d 33 (2012), review denied, California Supreme Court, Docket No. S206830 (Cal. January 23, 2013); *Griffin* v. *State*, 47 A.3d 487, 490–91 (Del. 2012); *Seattle* v. *Montana*, 129 Wn. 2d 583, 590–95, 919 P.2d 1218 (1996).

[30] The court in *Wooden* further observed that, even if it "assume[d] . . . solely for the sake of argument, that *Heller* would embrace the kind of knife that [Wooden] allegedly can prove she carried for use exclusively in self-defense," Wooden still could not establish plain error because, "[i]n finding [s]econd [a]mendment protection for possessing certain kinds of guns in the home for use in self-defense, the [United States] Supreme Court cautioned in *Heller* that it did 'not read the [s]econd [a]mendment to protect the right of citizens to carry arms for any sort of confrontation,' " and the undisputed facts of the case demonstrated that Wooden "was preparing for a confrontation anywhere, not just in defense of her home. Indeed, the fight did not occur anywhere near her home." (Footnotes omitted.) *Wooden* v. *United States*, supra, 6 A.3d 840.

[31] See *Aymette* v. *State*, supra, 21 Tenn. (2 Hum.) 158 ("[T]he arms, the right to keep which is secured, are such as are usually employed in civilized warfare, and that constitute the ordinary military equipment. . . . They need not, for such a purpose, the use of those weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin. These weapons would be useless in war." [Emphasis omitted.]); *English* v. *State*, supra, 35 Tex. 475 (second amendment "protects only the right to 'keep' such 'arms' as are used for purposes of war, in distinction from those [that] are employed in quarrels and broils, and fights between maddened individuals" [internal quotation marks omitted]); *State* v. *Workman*, supra, 35 W. Va. 373 (second amendment "must be held to refer to the weapons of warfare to be used by the militia, such as swords, guns, rifles, and muskets—arms to be used in defending the [s]tate and civil liberty—and not to pistols, bowie-knives, brass knuckles, billies, and such other weapons as are usually employed in brawls, street-fights, duels, and affrays, and are only habitually carried by bullies, blackguards, and desperadoes, to the terror of the community and the injury of the [s]tate").

[32] We note that *Aymette*, which rejected a state constitutional challenge to a statute that prohibited the carrying of a *concealed* bowie knife, or "Arkansas tooth-pick"; *Aymette* v. *State*, supra, 21 Tenn. (2 Hum.) 155, 161–62; lacks persuasive value in twenty-first century jurisprudence for the additional reason that, in sharp contradiction to *Heller*, the court limited the right to "bear arms" to weapons that, by their nature, must be carried openly in the military context. See id., 160–61 ("[The court rejects the argument that] there can be no difference between a law prohibiting the wearing [of] concealed weapons, and one prohibiting the wearing [of] them openly. . . . [I]f they were not allowed to bear arms openly, they could not bear them in their [defense] of the [s]tate at all. To bear arms in [defense] of the [s]tate, is to employ them in war, as arms are usually employed by civilized nations. The arms, consisting of swords, muskets, rifles, [etc.], must necessarily be borne openly . . . so that a prohibition to bear them openly, would be a denial of the right altogether. And as in their constitution, the right to bear arms in [defense] of themselves, is coupled with the right to bear them in [defense] of the [s]tate, we must understand the expressions as meaning the same thing, and as relating to public, and not private; to the common, and not the individual [defense].").

[33] Because *Heller* is so critical to the determination of whether a particular kind of knife falls within the purview of the second amendment's right to keep and bear arms—particularly *Heller*'s interpretation of the second amendment as affording the right to bear arms for the purpose of self-defense in the home—other, considerably more recent cases that predated *Heller* also lack persuasive force. For example, in *United States* v. *Nelsen*, 859 F.2d 1318 (8th Cir. 1988), the court rejected a second amendment challenge to

the Switchblade Knife Act, 15 U.S.C. §§ 1241 through 1245, which prohibits, inter alia, the interstate transportation or distribution of switchblade knives. See id., 1320. The conclusion of the court in *Nelsen*, however, followed its threshold determination that there was no merit to the claim of the defendant, Douglas John Nelsen, of "a fundamental right to keep and bear arms in that amendment," citing *United States* v. *Cruikshank*, 92 U.S. 542, 23 L. Ed. 588 (1876), and *United States* v. *Miller*, supra, 307 U.S. 174, among other cases, for the proposition that "this has not been the law for at least 100 years." *United States* v. *Nelsen*, supra, 1320; see id. ("Nelsen has made no arguments that the [Switchblade Knife] Act would impair any state militia, and [the court does] not see how such a claim could plausibly be made"); see also id., 1319–20 (applying rational basis review in rejecting substantive due process challenge to Switchblade Knife Act and concluding that Congress had "reasonable basis" for passing act, including reducing use of switchblades for criminal purposes and use of mail order businesses to evade individual states' switchblade bans); *Crowley Cutlery Co.* v. *United States*, 849 F.2d 273, 278 (7th Cir. 1988) ("[The defendant's] arguments do not come close to demonstrating the unconstitutionality of the Switchblade Knife Act. . . . Switchblade knives are more dangerous than regular knives because they are more readily concealable and hence more suitable for criminal use. So it is rational to ban them, [but] not regular knives as well. It would be absurd to suggest that the only lawful method of banning switchblade knives would be to ban all knives, including we suppose the plastic knives provided on airlines and in prison cafeterias." [Citation omitted.]). Because *Nelsen* rests on the premise that the second amendment does not confer a fundamental individual right to bear arms—a premise flatly rejected by the United States Supreme Court in *Heller* and *McDonald* v. *Chicago*, supra, 561 U.S. 742—*Nelsen* is not persuasive authority.

[34] We emphasize that our conclusion is limited to knives with characteristics of the dirk knife at issue in the present case, and we do not decide whether the second amendment embraces knives generally. But cf. D. Kopel et al., supra, 47 U. Mich. J.L. Reform 203 (asserting categorical position that all knives are subject to second amendment protection, and because they all "are less dangerous than handguns, which may legally be carried, any law that regulates the possession or carrying of knives, even the biggest and scariest knives . . . is indefensible under intermediate scrutiny"). Thus, we do not consider whether the right to keep and bear arms under the second amendment extends to other types of knives, including those identified in § 29-38 (a), such as switchblades and stilettos. Compare *State* v. *Lacy*, supra, 903 N.E.2d 492 (switchblade knives are not protected under second amendment), with *State* v. *Delgado*, supra, 298 Or. 403–404 (switchblade knives protected under Oregon constitution).

[35] The court observed that "[s]ome arms, although they have a valid use for the protection of the [s]tate by organized and instructed soldiery in times of war or riot, are too dangerous to be kept in a settled community by individuals, and, in times of peace, find their use by bands of criminals and have legitimate employment only by guards and police. Some weapons are adapted and recognized by the common opinion of good citizens as proper for private defense of person and property. Others are the peculiar tools of the criminal. The police power of the [s]tate to preserve public safety and peace and to regulate the bearing of arms cannot fairly be restricted to the mere establishment of conditions under which all sorts of weapons may be privately possessed, but it may take account of the character and ordinary use of weapons and interdict those whose customary employment by individuals is to violate the law. The power is, of course, subject to the limitation that its exercise be reasonable and it cannot constitutionally result in the prohibition of the possession of those arms [that], by the common opinion and usage of law-abiding people, are proper and legitimate to be kept [on] private premises for the protection of person and property." *People* v. *Brown*, supra, 253 Mich. 541.

[36] The court noted that Kessler had conceded "that the [Oregon] legislature could prohibit carrying a club in a public place in a concealed manner . . . but . . . maintain[ed] that the legislature [could not] prohibit all persons from possessing a club in the home. [Kessler] argued that a person may prefer to keep in his home a billy club rather than a firearm to defend against intruders." *State* v. *Kessler*, supra, 289 Or. 372.

[37] We note that, in *People* v. *Davis*, 214 Cal. App. 4th 1322, 155 Cal. Rptr. 3d 128 (2013), review denied, California Supreme Court, Docket No. S210601 (Cal. July 17, 2013), cert. denied,     U.S.    , 134 S. Ct. 659, 187 L. Ed. 2d 435 (2013), the California Court of Appeal determined that a jury reasonably

could have found that a baseball bat, modified with "holes in its handle [that] could reasonably be seen to make it easier to grip," and "[a] strap [that] could make it easier to carry and to swing," was a "billy" under a California statute prohibiting the possession of a deadly weapon. Id., 1328–29. The court then rejected the defendant's second amendment claim, which was predicated in large part on *State* v. *Kessler*, supra, 289 Or. 359. See *People* v. *Davis*, supra, 1331–33. The court declined to reach the issue of whether the modified bat fell within the meaning of the term "arms" for purposes of the second amendment on the ground that, in contrast to *Kessler* and *Heller*, "[the] defendant [in *Davis*] did not possess the modified bat in his home . . . but was carrying it in his car. The constitutional right to carry weapons outside the home was not addressed in *Kessler* [or] . . . *Heller*, [the latter of] which narrowly held that the District of Columbia's ban on 'possession [of lawful weapons] in the home violates the [s]econd [a]mendment . . . .'" (Emphasis omitted.) Id., 1332. The court in *Davis* further noted that the vehicle restriction does "not deprive persons of their ability to defend themselves or their homes, because there are alternative means to do so"; id.; citing *People* v. *Ellison*, 196 Cal. App. 4th 1342, 1351, 128 Cal. Rptr. 3d 245 (2011), for the proposition that a statute that prohibits the carrying of a concealed weapon in a vehicle "did not impair [the] ability to defend hearth or home because it did not prohibit possession of [a] loaded firearm in [the] home . . . [and] it did not prohibit [the] carrying [of a] firearm for self-defense because it exempted [the] carrying [of a] concealable firearm with [a] permit and [the] carrying [of a] firearm in [a] locked container." (Internal quotation marks omitted.) *People* v. *Davis*, supra, 1332. *Davis* is distinguishable from the present case, however, because, beyond the nature of the weapon involved, it did not involve a claim that the defendant was using his motor vehicle to transport the weapon from a former residence to a new one.

[38] Cf. *People* v. *Liscotti*, 219 Cal. App. 4th Supp. 1, 5, 162 Cal. Rptr. 3d 225 (App. Dept. Super. 2013) ("[A] full-size[d] modified baseball bat weighted with lead and wrapped in rope, does not appear . . . to fall into the classification of a weapon that would normally be possessed by a law-abiding citizen for a lawful purpose. Instead, it appears . . . to be a weapon [that], by its very nature, increases the risk of violence in any given situation, is a classic instrument of violence, and has a homemade criminal and improper purpose. Likewise, it appears to be the type of tool that a brawl fighter or a cowardly assassin would resort to using, designed for silent attacks, not a weapon that would commonly be used by a good citizen. . . . [The court] conclude[s] that possession of such a weapon is not protected by the [s]econd [a]mendment . . . ." [Citation omitted.]).

[39] Of course, the Rodney King case, on which the state relies, represents a misuse of the police baton. See *Koon* v. *United States*, supra, 518 U.S. 86–87. Virtually any instrumentality, however, even those that are not designed or intended to cause harm or injury, may be used in such an unlawful and destructive manner.

[40] We note that, after *Heller*, "[i]t remains unsettled whether the individual right to bear arms for the purpose of self-defense extends beyond the home." *Drake* v. *Filko*, 724 F.3d 426, 430 (3d Cir. 2013), cert. denied sub nom. *Drake* v. *Jerejian*, U.S. , 134 S. Ct. 2134, 188 L. Ed. 2d 1124 (2014). But see *Peruta* v. *San Diego*, 742 F.3d 1144, 1166 (9th Cir. 2014) ("the carrying of an operable handgun outside the home for the lawful purpose of self-defense, though subject to traditional restrictions, constitutes 'bear[ing] [a]rms' within the meaning of the [s]econd [a]mendment"); *Moore* v. *Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) ("The [United States] Supreme Court has decided that the [second] amendment confers a right to bear arms for self-defense, which is as important outside the home as inside. The theoretical and empirical evidence [which overall is inconclusive] is consistent with concluding that a right to carry firearms in public may promote self-defense."). Nevertheless, those courts that have "decline[d] to definitively declare that the individual right to bear arms for the purpose of self-defense extends beyond the home, the 'core' of the right as identified by *Heller* . . . do, however, recognize that the [s]econd [a]mendment's individual right to bear arms *may* have some application beyond the home." (Emphasis in original.) *Drake* v. *Filko*, supra, 431; see also *Kachalsky* v. *Westchester*, supra, 701 F.3d 89 ("What we know from [*Heller* and *McDonald*] is that [s]econd [a]mendment guarantees are at their zenith within the home. . . . What we do not know is the scope of that right beyond the home and the standards for determining when and how the right can be regulated by a government. This vast 'terra incognita' has troubled courts since *Heller* was

decided. . . . Although the [United States] Supreme Court's cases applying the [s]econd [a]mendment have arisen only in connection with prohibitions on the possession of firearms in the home, the [c]ourt's analysis suggests . . . that the [second] [a]mendment must have some application in the very different context of the public possession of firearms." [Citations omitted; emphasis omitted.]). For purposes of the present appeal, however, we need not determine the extent to which, if at all, the second amendment protects the right to carry weapons in public separate from the possession of those weapons in the home; rather, our analysis focuses solely on whether § 29-38 unduly infringes on the right to keep protected weapons in the home for self-defense by prohibiting the transportation of such weapons from one home to another.

[41] As we previously noted; see part I B of this opinion; in *State* v. *Campbell*, supra, 300 Conn. 380 n.6, this court construed the absolute prohibition in § 53-206 against carrying certain dangerous weapons, including dirk knives and police batons, as banning the carrying of those weapons in the home, even though there is no prohibition against owning them and storing them there. As we also noted, however, the court in *Campbell* did not consider whether this construction of § 53-206 comported with the dictates of the second amendment. See generally id. In light of our determination that dirk knives and police batons fall within the purview of the second amendment, the ban against carrying them in the home cannot be squared with constitutional requirements.

[42] As we explained, § 29-38 (b) contains exceptions to the prohibition against transporting the weapons identified in § 29-38 (a), but none of those exceptions applies to the defendant's transportation of the dirk knife and police baton in the present case, and none would apply if the defendant had been transporting those weapons to his home from their place of purchase.

[43] The state also acknowledged that the legislature did not want to "make it easy" for an owner of those weapons to possess them in the home. In fact, as we noted previously, under § 53-206, it is unlawful to carry a dirk knife or police baton under any circumstances.

[44] See, e.g., *United States* v. *Chovan*, supra, 735 F.3d 1138 (applying intermediate scrutiny to second amendment challenge to statutory ban on possession of firearms by domestic violence misdemeanant); *Drake* v. *Filko*, 724 F.3d 426, 428, 436 (3d Cir. 2013) (intermediate scrutiny applicable to determine constitutionality of licensing scheme requiring applicant to demonstrate " 'justifiable need' " for issuance of permit to carry handgun in public), cert. denied sub nom. *Drake* v. *Jerejian*, U.S. , 134 S. Ct. 2134, 188 L. Ed. 2d 1124 (2014); *Woollard* v. *Gallagher*, 712 F.3d 865, 876 (4th Cir.) (challenge to "good-and-substantial-reason requirement" for obtaining state handgun permit for carrying handgun outside home was subject to intermediate scrutiny), cert. denied, U.S. , 134 S. Ct. 422, 187 L. Ed. 2d 281 (2013); *Kachalsky* v. *Westchester*, supra, 701 F.3d 83, 96 (intermediate scrutiny appropriate for determination of whether licensing scheme requiring applicant to demonstrate " 'proper cause' " for issuance of license to carry concealed handgun in public passes muster under second amendment); *Heller* v. *District of Columbia*, supra, 670 F.3d 1261 (challenge to semiautomatic rifle and large capacity magazine ban subject to intermediate scrutiny); *Heller* v. *District of Columbia*, supra, 670 F.3d 1257 (constitutionality of firearm registration scheme evaluated under intermediate scrutiny); *United States* v. *Booker*, supra, 644 F.3d 25 (ban on prohibition against possession of firearms by person convicted of misdemeanor crime of domestic violence must satisfy intermediate scrutiny to withstand second amendment challenge); *United States* v. *Masciandaro*, supra, 638 F.3d 471 (intermediate scrutiny applicable to challenge to ban on carrying or possessing loaded handgun in motor vehicle within national park area); *United States* v. *Reese*, 627 F.3d 792, 802 (10th Cir. 2010) (applying intermediate scrutiny to second amendment challenge to 18 U.S.C. § 922 [g] [8], which prohibits individual from possessing firearm while being subject to domestic protection order), cert. denied, U.S. , 131 S. Ct. 2476, 179 L. Ed. 2d 1214 (2011); *United States* v. *Marzzarella*, supra, 614 F.3d 97 (ban on possession of weapon with obliterated serial number must pass intermediate scrutiny); *Shew* v. *Malloy*, supra, 994 F. Supp. 2d 247 (challenge to semiautomatic firearm and large capacity magazine ban reviewed under intermediate scrutiny standard); *New York State Rifle & Pistol Assn.*, *Inc.* v. *Cuomo*, 990 F. Supp. 2d 349, 367 (W.D.N.Y. 2013) (challenge to law restricting, inter alia, availability of assault weapons and large capacity magazines reviewed under intermediate scrutiny standard).

[45] For example, in *Ezell* v. *Chicago*, supra, 651 F.3d 684, the Seventh Circuit

Court of Appeals held that the plaintiffs were very likely to prevail on their second amendment challenge to an ordinance of the defendant, the city of Chicago (city), that simultaneously mandated firing range training as a condition of lawful firearm possession and banned firing ranges in the city. Id., 689–90. In reaching its conclusion, the court observed that "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right [would not] mean much without the training and practice that make it effective." Id., 704. The court described the range ban, which "prohibit[ed] the law-abiding, responsible citizens of [the city] from engaging in target practice in the controlled environment of a firing range"; (internal quotation marks omitted) id., 708; as "a serious encroachment on the right to maintain proficiency in firearm use, an important corollary to the meaningful exercise of the core right to possess firearms for self-defense. That the [c]ity conditions gun possession on range training is an additional reason to closely scrutinize the range ban." (Emphasis omitted.) Id. Observing that the city's own witnesses had "testified to several common-sense range safety measures that could be adopted short of a complete ban"; id., 709—measures that were designed to address the city's interest in preventing firearms accidents and the possible theft of firearms from range users by criminals; see id., 692—the court concluded that the "the [firing range] ban [was] wholly out of proportion [with] the public interests the [c]ity claims it serves." Id., 710. Indeed, even the concurring judge, who would have afforded more credence to the city's articulated public safety concerns, nevertheless agreed that the ordinance was unconstitutional to the extent that it barred gun owners from transporting their weapons for practice purposes. See id., 715 (Rovner, J., concurring in the judgment) ("if the ordinance both prohibits gun owners from transporting their own weapons and prevents ranges from lending weapons for practice, then those aspects of the ordinance must be enjoined").

[46] In *Bateman* v. *Perdue*, 881 F. Supp. 2d 709 (E.D.N.C. 2012), for example, the District Court applied strict scrutiny in invalidating a North Carolina statutory scheme that made it a misdemeanor "for any person to transport or possess off his own premises *any dangerous weapon* or substance in any area in which a state of emergency has been declared"; (emphasis added; internal quotation marks omitted) id., 711; and "authorize[d] government officials to impose further prohibitions and [restrictions on] the possession, transportation, sale, purchase, storage, and use of dangerous weapons and substances during a state of emergency." (Internal quotation marks omitted.) Id. In concluding that these statutes violated the second amendment, the court emphasized that they "burden[ed] the rights of [law-abiding] citizens"; id., 715; and, "[m]ost significantly . . . [prohibited law-abiding] citizens from purchasing and transporting to their homes firearms and ammunition needed for self-defense." Id.; see also id., 715–16 (noting that, under challenged statutory scheme, "government officials may . . . ban the possession, transportation, sale, purchase, storage or use of dangerous firearms and ammunition during a declared state of emergency—even within one's home where the need for defense of self, family, and property is most acute" [internal quotation marks omitted]).

[47] See, e.g., *Young* v. *Hawaii*, 911 F. Supp. 2d 972, 990 (D. Haw. 2012) ("[The challenged statutes] require that firearms be confined to the possessor's place of business, residence or sojourn but allow lawful transport between those places and repair shops, target ranges, licensed dealerships, firearms shows, firearms training, and police stations. . . . People with a license to carry . . . are exempt from the provisions. [The statutes] do not violate . . . [s]econd [a]mendment rights. [They] do not restrict the core protection afforded by the [s]econd [a]mendment. . . . They only apply to carrying a weapon in public." [Citations omitted; internal quotation marks omitted.]); *Doe* v. *Wilmington Housing Authority*, 880 F. Supp. 2d 513, 535 (D. Del. 2012) (applying intermediate scrutiny in rejecting second amendment challenge to public housing authority policy prohibiting possession of firearms in common areas of housing projects upon concluding that fit between restriction and authority's interest in safety was "reasonable" because, inter alia, "residents are permitted to lawfully possess firearms within the confines of their homes, that is, their particular assigned units," "[r]esidents . . . have the right to transport lawfully owned and obtained weapons to and from their units," and, "in the course of such transportation, should the need arise, they may use their weapons for purposes of self-defense"), rev'd in part on other grounds, 568 Fed. Appx. 128 (3d Cir. 2014); *Williams* v. *State*, 417 Md. 479, 486–87, 496–97, 10 A.3d 1167 (holding that state statute prohibiting carrying or transporting of handgun without permit

did not violate second amendment when statute also provided exceptions for, inter alia, home possession, moving, repair, and travel to and from place of purchase and sale), cert. denied,      U.S.     , 132 S. Ct. 93, 181 L. Ed. 2d 22 (2011).

[48] Compare *Griffin* v. *State*, 47 A.3d 487, 491 (Del. 2012) (defendant had state constitutional right to carry concealed knife in his home), with *People* v. *Mitchell*, 209 Cal. App. 4th 1364, 1375–76, 148 Cal. Rptr. 3d 33 (2012) (applying intermediate scrutiny and rejecting second amendment challenge to statute proscribing carrying of concealed dirk or dagger because [1] "the statute does not apply to the open carrying of a dirk or dagger, and it excludes from its coverage an openly suspended sheathed knife, as well as nonswitchblade folding and pocketknives kept in a closed or unlocked position," [2] "the statute provides other means of carrying a dirk or dagger for self-defense," [3] "[t]he statute does not contain any express restriction on concealment of weapons on the person at home, and [4] to the extent it is capable of being applied improperly in the home context . . . any overbreadth can be cured on a case-by-case basis"), review denied, California Supreme Court, Docket No. S206830 (Cal. January 23, 2013), and *Seattle* v. *Montana*, 129 Wn. 2d 583, 595–96, 919 P.2d 1218 (1996) (rejecting state constitutional challenge to municipal ordinance that restricted carrying of dangerous knife because ordinance was "not a complete ban on the possession and carrying of knives" insofar as it permitted "possession of fixed blade knives at home or [at] a place of business," and carrying "for hunting or fishing purposes, for work, or to and from home or work").

---